**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**


CLARENCE JAMES JONES,

       Petitioner,

v.                                     CASE NO.  4:00cv96-RH

KENNETH S. TUCKER, Secretary,
Florida Department of Corrections,

       Respondent.

_____/


## ORDER DENYING THE PETITION


By petition for a writ of habeas corpus under 28 U.S.C. § 2254, Clarence James Jones challenges his state-court conviction and death sentence.  This order denies the petition.

### Facts and Procedural History

Mr. Jones escaped from a Maryland prison and was in Tallahassee with fellow escapees Henry Goins and Irvin Griffin.  These three and Beverly Harris

were seated in a stolen car when Tallahassee police officers Greg Armstrong and

Ernest Ponce de Leon confronted them.  As Officer Armstrong checked the

driver's identification and Officer Ponce de Leon ran a computer check on the

license plate, one of the car's occupants—overwhelming evidence indicates it was

Mr. Jones—opened fire on the officers.  Officer Ponce de Leon was hit and died at

the scene.  Officer Armstrong fired back.  Mr. Jones absconded on foot with

Officer Ponce de Leon's service weapon, accompanied by Mr. Griffin.  Police

captured both men after they broke into a nearby home.

 The state indicted Mr. Jones, Mr. Goins, and Mr. Griffin on charges that

included first-degree murder.  Mr. Goins negotiated a guilty plea to second-degree

murder in exchange for a 30-year sentence.  The state tried Mr. Jones and Mr.

Griffin together.  Ms. Harris testified that Mr. Jones was the shooter.  Other

evidence pointed to him as well.  But Mr. Jones testified that the four met up with a

drug dealer and that *the dealer* shot the officer.  The jury convicted both Mr. Jones

and Mr. Griffin.  In separate penalty proceedings Mr. Griffin received a life

sentence while the jury recommended death for Mr. Jones by an 11–1 vote.  The

judge sentenced Mr. Jones to death.

 The Florida Supreme Court affirmed Mr. Jones's conviction and sentence on

direct appeal.  *Jones v. State*, 580 So. 2d 143 (Fla. 1991) (*Jones I*).  The United

States Supreme Court denied certiorari.  *Jones v. Florida*, 502 U.S. 878 (1991).

Mr. Jones filed a motion for postconviction relief in state court under Florida Rule

of Criminal Procedure 3.850.  The trial court denied the motion, and the Florida

Supreme Court affirmed.  *Jones v. State*, 732 So. 2d 313 (Fla. 1999) (*Jones II*).

Mr. Jones filed the petition under review in this court while simultaneously filing a

petition for a writ of habeas corpus in the Florida Supreme Court.  Proceedings in

this court were stayed pending a ruling on the state habeas petition.  The Florida

Supreme Court denied the petition and denied rehearing.  *Jones v. Moore*, 794 So.

2d 579 (Fla. 2001) (*Jones III*).  Mr. Jones later filed an amended petition in this

court, and the state responded.

A second stay was entered pending the Florida Supreme Court's

determination of unrelated cases presenting claims under *Ring v. Arizona*, 536 U.S.

584 (2002) and *Atkins v. Virginia*, 536 U.S. 304 (2002).  The Florida Supreme

Court later issued opinions in those cases.  *See Bottoson v. Moore*, 833 So. 2d 693

(Fla. 2002); *King v. Moore*, 831 So. 2d 143 (Fla. 2002).  Those opinions left

unsettled the question whether the Florida Supreme Court would ultimately declare

Florida's sentencing scheme unconstitutional under *Ring* or clarify the application

of *Atkins* in Florida courts.  Because Mr. Jones was pursuing in state court a

motion for postconviction relief under both *Ring* and *Atkins*, the stay in this court

remained in effect pending resolution of the state-court proceedings.  The Florida

courts ultimately denied Mr. Jones's *Atkins* and *Ring* claims, *see Jones v. State*,

962 So. 2d 337 (Fla. 2007) (*Jones IV*), and denied rehearing.

## Summary of Claims

Mr. Jones asserts seven claims in this court: that his attorney rendered ineffective assistance in the trial's penalty phase; that the state withheld exculpatory evidence in the penalty phase in violation of *Brady v. Maryland*, 373 U.S. 83 (1963); that Mr. Jones's attorney was ineffective on direct appeal, including by failing to assert penalty-phase errors; that the sentencing judge erred by failing to find mitigators; that the trial court erroneously instructed the jury on aggravators; that after disapproving aggravators on which the jury was instructed, the Florida Supreme Court erred by failing to reweigh the aggravators and mitigators or to conduct a harmless-error analysis; and that Mr. Jones is mentally retarded and thus ineligible for a death sentence under *Atkins v. Virginia*, 536 U.S. 304 (2002).  This order addresses each claim in turn.

## Applicability of AEDPA

Mr. Jones claims at the outset that the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") does not apply to his petition because the crime occurred before its enactment.  The United States Supreme Court has rejected the assertion.  *See*, *e.g.*, *(Michael) Williams v. Taylor*, 529 U.S. 420, 429 (2000) ("Petitioner filed his federal habeas petition after AEDPA's effective date, so the statute applies to his case." (citing *Lindh v. Murphy*, 521 U.S. 320, 326-27

(1997))).

## Standard of Review

A federal habeas court may set aside a state court's ruling on the merits of a petitioner's claim only if the ruling "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or if the ruling "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A long line of cases addresses these standards. *See*, *e.g.*, *(Terry) Williams v. Taylor*, 529 U.S. 362, 396 (2000); *Morris v. Secretary, Dep't of Corr.*, No. 09-15471, 2012 WL 1370848 (11th Cir. Apr. 20, 2012). No purpose would be served by repeating here all the analysis set out in the many cases.

## Evidentiary Hearing

Mr. Jones has requested an evidentiary hearing. But he had an evidentiary hearing on his collateral claim in state court and had a full and fair opportunity to develop the factual basis for the claims that were not procedurally barred. *See Jones II*, 732 So. 2d 313 (Fla. 1999). Mr. Jones has not suggested "a factual predicate that could not have been previously discovered through the exercise of due diligence." 28 U.S.C. § 2254(e)(2)(A)(ii). And in any event, "a habeas petitioner is entitled to an evidentiary hearing if he or she alleges facts that, if

proved at the hearing, would entitle petitioner to relief." *Breedlove v. Moore*, 279

F.3d 952, 960 (11th Cir. 2002) (quoting *Meeks v. Singletary,* 963 F.2d 316, 319

(11th Cir. 1992)).  Mr. Jones has not met this standard.

## Claim I: Ineffective Assistance in the Penalty Phase

In claim I Mr. Jones asserts that his attorney was ineffective in the trial's

penalty phase.

### A.  Standard of Review

The standard governing an ineffective-assistance claim is well established

and was at the time of the state-court adjudication.  *See Strickland v. Washington*,

466 U.S. 668 (1984).  A petitioner "must show that his lawyer's performance fell

below an 'objective standard of reasonableness' and that the lawyer's deficient

performance prejudiced the petitioner."  *Van Poyck v. Fla. Dep't of Corrs.*, 290

F.3d 1318, 1322 (11th Cir. 2002) (quoting *Strickland*, 466 U.S. at 688); *see also*

*Bell v. Cone*, 535 U.S. 685, 695 (2002) (noting the need for "proof of both

deficient performance and prejudice to the defense").

A "strong presumption" exists "that counsel's performance was reasonable

and that counsel made all significant decisions in the exercise of reasonable and

professional judgment."  *Van Poyck*, 290 F.3d at 1322 (quoting *Chandler v. United*

*States*, 218 F.3d 1305, 1314 (11th Cir. 2000) (en banc)).  This presumption

specifically applies to an attorney's decision not to present mitigating evidence—a

decision that, if undertaken after thorough investigation, is "virtually unchallengeable," and if undertaken after less than thorough investigation, is reasonable "precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690-91; *see also Wiggins v. Smith*, 539 U.S. 510, 523 (2003) (noting that on the question of the investigation supporting a decision not to present a mitigation case, the court must "conduct an objective review of . . . performance, measured for 'reasonableness under prevailing professional norms' " (quoting *Strickland*, 466 U.S. at 688)).

### B.  Facts

To prepare for the penalty phase, Mr. Jones's attorney spoke with three people in Mr. Jones's hometown of Baltimore.  (C-4 at 24.)[1]  The attorney did not travel to Baltimore.  (C-4 at 26.)  Instead, the attorney relied on Mr. Jones's prison records, because Mr. Jones had spent the majority of his life in custody.  (C-4 at 27-28.)  The attorney concluded that no one in Mr. Jones's family was interested in appearing at the penalty phase; they declined to attend due to lack of funds and, when offered funds, claimed illness.  (C-4 at 28-30.)

The attorney believed that the prison records were sufficient to permit expert analysis for penalty-phase purposes.  (C-4 at 65.)  The attorney received court

---

[1] This order cites the amended petition as "Pet."  The order cites the response as "Resp."  The order cites the record by the attachment numbers (e.g., C-5) to the response.

authorization to employ an expert, Dr. Lawrence Annis, on the day that the jury

returned the guilty verdict.  (C-4 at 31.)  The attorney told the court at that time

that he was unable to proceed immediately with the penalty phase: "I've had no

chance to confer with the individual that was involved and act on any kind of

information that he can make available [and] there are some family members in

Maryland that I would like to compel the attendance, and we can't do it today or

tomorrow."  (A-25 at 3391.)  The court delayed the penalty phase until three days

after Mr. Jones's attorney first discussed the case with Dr. Annis.  (C-4 at 33.)  Mr.

Jones now says that the attorney failed to compile a complete life history because

he did not obtain school or medical records, or interview friends, neighbors,

teachers, or medical personnel.  (Pet. at 14, ¶ 12.)

    The attorney asked Dr. Annis to address the possibility of mental retardation,

but the attorney did not recall asking Dr. Annis to address statutory mental-health

mitigators, did not recall addressing substance abuse (chronic or at the time of the

offense), and did not inquire deeply into Mr. Jones's HIV-positive status.  (C-4 at

45-47.)  During the guilt phase the attorney consciously minimized Mr. Jones's

substance abuse and HIV status.  (C-4 at 66.)  But Dr. Annis's penalty-phase

testimony did touch on substance abuse and HIV.  (A-26 at 3437-49.)  The attorney

testified he did not pursue statutory mental-health mitigators because Dr. Annis

told him that Mr. Jones had at least a "street level" IQ and felt free of any coercion

or compulsion at the time of the murder.  (C-4 at 68.)  Dr. Annis briefly discussed

IQ in his testimony but did not address organic brain damage.  (A-26 at 3437-49.)

Mr. Jones now claims to have established organic brain damage in the

postconviction hearing.   (Pet. at 40-41, ¶¶ 63-64.)

Dr. Annis testified based on Mr. Jones's prison records, his conversations

with Mr. Jones, and the IQ test Dr. Annis administered.  On cross-examination, the

state made much of the fact that Dr. Annis met Mr. Jones just three days before Dr.

Annis testified, that they had met for a total of less than four hours, that Dr. Annis

had not interviewed anyone else, and that Dr. Annis relied primarily on what Mr.

Jones told him during the interviews.  (A-26 at 3449-50.)

Mr. Jones presented a number of witnesses at the postconviction hearing in

an effort to demonstrate that the attorney's performance was deficient and

prejudicial.

A licensed clinical social worker—Cecilia Alfonso—went to Baltimore and

interviewed Mr. Jones's three sisters and the mother of his son.  (C-4 at 79, 82-85.)

Ms. Alfonso learned:

· when Mr. Jones was three months old, his mother was incarcerated for
  neglect and remained in jail for six to eight months (C-4 at 87);

· Mr. Jones's mother was an alcoholic who frequently would serve beer
  to him when he was as young as age three or four (C-4 at 126);

· Mr. Jones's mother carried on an open, long-term affair with a
  neighbor—a relationship that caused physical and emotional

altercations that Mr. Jones witnessed (C-4 at 90);

·    Mr. Jones's father shot at his wife's paramour during a party at Mr. Jones's house, and when Mr. Jones was no older than five, his mother left home to live with the paramour for an extended period (C-4 at 90-91);

·    Mr. Jones witnessed an altercation in which his father beat his mother with brass knuckles, she grabbed his gun and chased him out of the house, and the father wrested the gun from the mother and shot her (C-4 at 91-92);

·    Mr. Jones saw a sister stab a brother to death (C-4 at 94);

·    when Mr. Jones was 11, his father died in a house fire set by a homeless woman whom the father had taken in but then asked to leave (C-4 at 96-97);

·    the brother to whom Mr. Jones felt closest was shot to death during a craps game (C-4 at 100-01).

Mr. Jones's sister testified at the hearing, verifying these facts and indicting that of three of his four brothers died while Mr. Jones was young, two violently. The remaining, older brother was constantly jailed.  (C-4 at 123-26.)

The mother of Mr. Jones's two children testified that she had not spoken to Mr. Jones since their daughter died in 1983 but that she would have testified on his behalf at the penalty phase had she been asked.  (C-4 at 149-50.)

Dr. Jethro Toomer, a criminal and forensic psychologist, interviewed Mr. Jones and others.  He opined based on testing that Mr. Jones had a nonverbal IQ in the 67–71 range, with diminished reading, spelling, and mathematical skills.  (C-5 at 177-79.)  Dr. Toomer diagnosed Mr. Jones as suffering depression, significant

deficits in self-concept, and a history of substance abuse and poor social adjustment.  (C-5 at 179.)  In addition to rendering opinions on the behavioral consequences of Mr. Jones's social environment and upbringing, Dr. Toomer noted a history of family mental-health problems.  (C-5 at 185-86.)  Dr. Toomer further opined that Mr. Jones probably suffered from neurological impairment or organic brain damage, lacking the capacity to weigh consequences or explore alternative acts, resulting in a "here and now" approach to problem-solving.  (C-5 at 190.)  Dr. Toomer concluded that Mr. Jones suffered from an extreme mental or emotional disturbance and that his capacity to conform his conduct to the law was substantially impaired at the time of the murder—a statutory mitigating factor.  (C-5 at 191-92.)

Dr. Barry Crown, a neuropsychologist, examined Mr. Jones and concluded that he suffered from a "significant" neuropsychological impairment that affected his behavior.  (C-5 at 211-12.)  Dr. Crown testified that this conclusion could not have been reached simply by observing Mr. Jones and conducting clinical intake tests as Dr. Annis had done.  (C-5 at 212-13.)  Dr. Crown's interviews with Dr. Toomer and Ms. Alfonso, coupled with the interviews of family members and Mr. Jones himself, yielded a conclusion that Mr. Jones was functioning with an 8 1/2 year old's capacity to abstract.  (C-5 at 214-15.)  Like Dr. Toomer, Dr. Crown concluded that Mr. Jones suffered from an extreme mental or emotional

disturbance and that his capacity to conform his conduct to the law was substantially impaired at the time of the murder.  (C-5 at 217.)

Dr. Scott Folk, a physician who is board certified in infectious diseases, testified that Mr. Jones would eventually develop AIDS and that there was no cure for the disease.  (C-5 at 256-57.)

### C.  Issues

Mr. Jones asserts that he has met both prongs of *Strickland*: that the attorney's performance was deficient and that Mr. Jones suffered prejudice.

### 1.  Deficient Performance

Mr. Jones asserts the attorney's performance was deficient in two respects. First, Mr. Jones says the attorney failed to seek out and present all available mitigation evidence, including Mr. Jones's life history.  (Pet. at 33, ¶ 53.)  Second, Mr. Jones says the attorney's performance was deficient because he failed to provide relevant information to Dr. Annis.  (Pet. at 35, ¶ 56 *et seq.*)

An attorney must conduct a reasonable investigation into a defendant's background in an effort to present adequate mitigation evidence.  *See*, *e.g.*, *(Terry) Williams*, 529 U.S. at 396, 398 (recognizing an "obligation to conduct a thorough investigation of the defendant's background" and finding that the "description of Williams' childhood, filled with abuse and privation, or the reality that he was 'borderline mentally retarded,' might well have influenced the jury's appraisal of

his moral culpability").

But an attorney's performance is presumed effective when the attorney deliberately chooses not to introduce all mitigating evidence. *Bell*, 535 U.S. at 698; *Jackson v. Herring*, 42 F.3d 1350, 1366 (11th Cir. 1995). Similarly, a choice not to pursue or investigate mitigating evidence is presumed effective if reasonably and consciously made. *Jackson*, 42 F.3d at 1367.

Whether a failure to investigate was a tactical choice or a result of oversight is a question of fact on which a state court's determination must be overcome by clear and convincing evidence. *Id.* Whether a tactical choice was "a *reasonable* one, falling within the range of professional competence," is a legal issue. *Id.* (emphasis in original) (citations omitted). That is, a strategic decision cannot be deemed reasonable "when the attorney has failed to investigate his options and make a reasonable choice between them." *Id.* (quoting *Horton v. Zant*, 941 F.2d 1449, 1462 (11th Cir. 1991)). An attorney's performance is deficient if the attorney "did not conduct enough investigation to formulate an accurate life profile." *Id.*; *see also id.* ("Although counsel need not 'investigate every evidentiary lead,' he must gather enough knowledge of the potential mitigation evidence to arrive at an 'informed judgment' in making that decision." (citation omitted)); *see also Harris v. Dugger*, 874 F.2d 756, 763 (11th Cir. 1989) (performance deficient where, due to total absence of investigation, counsel failed

to explore family, scholastic, military, or employment information); *Middleton v. Dugger*, 849 F.2d 491, 493-94 (11th Cir. 1988) (deeming performance deficient where limited investigation failed to reveal "overwhelming" documentation of psychiatric history, brutal childhood, drug abuse, and low IQ, and where no life history was presented during penalty phase); *Magill v. Dugger*, 824 F.2d 879, 889 (11th Cir. 1987) (psychiatrist testified that he was never asked to analyze defendant regarding applicability of statutory mitigating factors).

An attorney must ensure that the defendant receives appropriate mental-health assistance, including, when appropriate, a mental-health expert armed with sufficient information. *Clisby v. Jones*, 960 F.2d 925, 934 n.12 (11th Cir. 1992) ("[W]e have difficulty envisioning a case in which counsel's failure to alert the trial court to the manifest inadequacy of an expert's psychiatric assistance would not violate the defendant's right to effective assistance of counsel under the Sixth Amendment.") (dicta); *Magill*, 824 F.2d at 889 (deeming an attorney's performance deficient when, between two psychiatrists, the attorney called only a court-appointed psychiatrist who was never asked to analyze the defendant regarding statutory mitigating factors).

## 2. Prejudice

Mr. Jones presented evidence at the postconviction hearing of his extreme mental and emotional disturbance, his impaired ability to appreciate the criminality

of his conduct, and his concomitant inability to conform his conduct to the requirements of the law.  These are statutory mitigating factors.  *See* Fla. Stat. § 921.141(6)(b) & (f).  Mr. Jones presented evidence that he suffered organic brain damage and abuse as a child, recognized nonstatutory mitigators.  *See Campbell v. State*, 571 So. 2d 415, 420 n.4 (Fla. 1990)*; State v. Sireci*, 536 So. 2d 231, 233 (Fla. 1988).  Mr. Jones asserts that the state did not rebut this evidence.  (Pet. at 43, ¶¶ 67, 68.)  Mr. Jones also cites postconviction evidence that he says demonstrates "[e]vents that result in a person succumbing to the passions or frailties inherent in the human condition"—another recognized nonstatutory mitigator.  *Cheshire v. State*, 568 So. 2d 908, 912 (Fla. 1990).  (Pet. at 44, ¶ 68.)

As proof of prejudice, Mr. Jones relies on the trial judge's failure to find mitigators.  (Pet. at 45-48, ¶¶ 70-71.)  Mr. Jones says that had his trial attorney introduced the evidence presented at the postconviction hearing, the trial judge would have had no choice but to find these statutory and nonstatutory mitigators.  Mr. Jones says the death penalty would not have been imposed.  (Pet. at 49-50, ¶ 75.)

Mr. Jones cites a number of cases for the unremarkable proposition that a failure to present any mitigating evidence at all—so long as some is available—results in prejudice.  *See Dobbs v. Turpin*, 142 F.3d 1383, 1390 (11th Cir. 1998) (prejudice resulted from counsel's failure to present any mitigating

evidence, including that regarding the defendant's "unfortunate" upbringing);

*Jackson*, 42 F.3d at 1368-69 (prejudice found where counsel failed to present any

mitigating evidence, including that of a "brutal and abusive" childhood); *Harris*,

874 F.2d at 763 (prejudice found where counsel failed altogether to present

mitigating evidence including a life of hardship).  *But see Trease v. State*, 768 So.

2d 1050, 1055 (Fla. 2000) (holding that a sentencing judge may accord little or no

weight to nonstatutory mitigating factors).

### D.  Merits of the State-Court Decision

On collateral review, the Florida Supreme Court summarized the relevant

facts and addressed the trial attorney's investigation, Dr. Annis's mental-health

evaluation, and the trial court's rationale for denying relief.  *Jones II*, 732 So. 2d at

315-21.  The Florida Supreme Court properly identified *Strickland* as the

governing authority.  *Id.* at 319.  The court upheld the factual determination that

the trial attorney attempted to enlist the support of Mr. Jones's family members and

determined based on his conversations with them that their testimony would not

help.  *Id.*  The court noted the trial attorney's conclusion that Mr. Jones's prison

records comprised sufficient evidence of his background given that much of his life

had been spent behind bars.  *Id.*  Noting the trial attorney's extensive experience,

the Florida Supreme Court gave great deference to these "tactical" decisions.  *Id.* at

320 n.5.

The court concluded that Dr. Annis was "eminently qualified" and presented "strong testimony in mitigation of a death sentence." *Id.* at 320. The court noted that Mr. Jones's postconviction presentation did not attack Dr. Annis's evaluation but instead relied on experts who reached contrary conclusions. *Id.* The court observed that "[t]he evaluation by Dr. Anis is not rendered less than competent . . . simply because appellant has been able to provide testimony to conflict with that presented by Dr. Anis." *Id.* This mirrored the trial court's analysis:

> The record is clear that defense counsel did obtain a mental health evaluation and that he did present the testimony of the expert during the penalty phase. The problem is that the evaluation did not yield a favorable result. Trial counsel explained during the evidentiary hearing that the reason he did not ask the expert a direct question regarding the existence of the statutory mitigating circumstances is that the expert had told him beforehand that he could not testify that those factors existed in the defendant's case.

*Id.* at 318 (quoting *State v. Jones*, No. 88-3111, order at 4-8 (Fla. Cir. Ct. Mar. 31, 1997)).

This correctly refutes Mr. Jones's position that effective assistance necessarily would have revealed the significant neuropsychological impairment to which Drs. Toomer and Crown testified. Dr. Annis, a well qualified clinical psychologist, performed what Dr. Crown acknowledged was "a good clinical evaluation from the standpoint of a clinical psychologist." (C-5 at 225.) It was not objectively unreasonable for the attorney to rely on Dr. Annis's analysis and not to seek on his own further testing that Dr. Annis thought was unnecessary. At the

very least, the Florida Supreme Court's conclusion that this was so was not contrary to or an unreasonable application of *Strickland* or any other United States Supreme Court decision, nor was the Florida Supreme Court's decision based on an unreasonable determination of the facts.

The same is true of the attorney's selection of the information he provided to Dr. Annis. The trial court found the attorney's explanation of his investigation reasonable. The Florida Supreme Court agreed. The decision was not contrary to or an unreasonable application of *Strickland* or any other United States Supreme Court decision, nor was the decision based on an unreasonable determination of the facts.

Finally, the Florida Supreme Court accepted as a tactical decision the attorney's election not to argue to the jury Mr. Jones's HIV-positive status for fear that it would do more harm than good. *Jones II*, 732 So. 2d at 320. Only by knowing the result—that the jury recommended death—could one question the attorney's decision. This is the kind of tactical decision that attorneys are called on to make every day. The attorney's decision was reasonable and was not ineffective.

The Florida Supreme Court also rejected Mr. Jones's claim of prejudice. The court noted that the jury and sentencing judge were aware of many of the alleged statutory and nonstatutory mitigating circumstances, and the court

concluded that there was no "reasonable probability that, absent the claimed errors, the sentencer would have concluded that the balance of the aggravating and mitigating circumstances did not warrant death." *Id.* The court emphasized that the death sentence rested on objectively confirmed aggravators. *Id.* at 318-19 (quoting the trial record).

### E. Conclusion

In hindsight, knowing that the mitigation evidence as actually presented failed to sway 11 jurors or the sentencing judge, it might well be said that the trial attorney should have contacted one or more additional mental-health professionals or should have presented testimony of family members. But the question is not whether, in hindsight, the attorney should have pursued a broader investigation or should have introduced more or better evidence; the question is whether, at the time, any reasonable attorney would have done so. And even if it could be said that the attorney rendered ineffective assistance, Mr. Jones would be entitled to relief in this court only on a showing of prejudice. The Florida Supreme Court's conclusion that the attorney did not render ineffective assistance and that in any event Mr. Jones suffered no prejudice was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court. Nor was the conclusion based on an unreasonable determination of the facts as established by the state-court record. Indeed, the Eleventh Circuit recently refused

to grant habeas relief to a petitioner whose ineffectiveness claim was similar to, but stronger than, Mr. Jones's.  *See Price v. Allen*, No. 09-11716, 2012 WL 1059111 (11th Cir. Mar. 30, 2012).  Mr. Jones is not entitled to relief on this claim.

## Claim II: *Brady*

In claim II Mr. Jones asserts that the state withheld exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963).  *Brady* held unconstitutional the prosecution's suppression of evidence materially favorable to the accused. Here the state failed to disclose a memorandum written by Deputy Sheriff Gary Bevis recounting a statement allegedly made by an inmate, Kevin Eason, that Mr. Griffin told Mr. Eason that Mr. Griffin—not Mr. Jones—was the shooter.  Mr. Jones learned of the memorandum only in the postconviction process.  The state says this claim is procedurally barred and that in any event there was no *Brady* violation.

### A.  Facts

Mr. Jones obtained through postconviction discovery Deputy Bevis's three-page memorandum addressing his discussion with Mr. Eason.[2]  Deputy Bevis was

---

[2] The memorandum is in the record.  (C-1 at 167-69.)   Deputy Bevis's testimony indicates that the interview was recorded on audiotape, but that Deputy Bevis is "not quite sure what [he] did with the tape . . . ."  (C-5 at 324-25.)  The memorandum corroborates that the interview was taped.  (C-1 at 167.)  According

investigating a scheme to escape from the jail.  The scheme apparently involved

Mr. Eason, Mr. Griffin, Mr. Jones, and Mr. Goins.  (C-5 at 321.)  Mr. Eason was

Mr. Griffin's cellmate.

>      According to the memorandum, Mr. Eason first told Deputy Bevis that Mr.

Griffin told Mr. Eason that he (Mr. Griffin) shot the officer.  Later in the interview,

Mr. Eason told Deputy Bevis that Mr. Griffin said that Mr. Jones was the shooter.[3]

Finally, Mr. Eason told Deputy Bevis that Mr. Griffin wanted the phone number

for the officer's son so Mr. Griffin could tell him that he (Mr. Griffin) had killed

the officer.[4]

>      Mr. Eason testified at the postconviction hearing.  He said that Mr. Griffin

told him that *Mr. Jones* shot the officer.  (C-5 at 312.)  Mr. Eason denied on cross-

examination that Mr. Griffin ever said the he (Mr. Griffin) was the shooter.  (C-5 at

313-14.)  This testimony was consistent with a statement Mr. Eason gave earlier

---

to  Deputy Bevis, he should have "provided [the tape] to the ID unit as evidence,"
but the ID unit does not have the tape, and no property receipt could be found to
indicate that it was turned over.  (C-5 at 325.)

   [3] The memorandum says: "Griffin further told Eason that he (Griffin) killed
Ponce de Leon and that he (Griffin) shot him in the chest."  (C-1 at 167.)  On the
next page the memorandum says: "Griffin also stated that Jones was going to plead
guilty only if Griffin and Goins would get him out of prison because he (Jones) did
actually shoot him." (C-1 at 168.)

   [4] The memorandum says:  "Griffin also wanted the phone number of Ponce
de Leon's son's home, and call him and tell his son that he was the one that killed
his father." (C-1 at 169.)

that week to representatives from the sheriff's office.  (C-1 at 174-75.)  At the

hearing, Mr. Eason denied telling Deputy Bevis that Mr. Griffin said he was the

shooter.  (C-5 at 314-15.)  Mr. Eason also denied having said that Mr. Griffin

wished to obtain the phone number of the officer's son.  (C-5 at 316.)

Deputy Bevis also testified at the postconviction hearing.  According to

Deputy Bevis, page one of the memorandum reflected Mr. Eason's statement that

Mr. Griffin said he was the shooter.  (C-5 at 322.)  Page two reflected Mr. Eason's

statement that Mr. Jones would plead guilty to the murder only if Mr. Griffin and

Mr. Goins managed to escape.   Deputy Bevis confirmed that at page two of the

memorandum, Mr. Eason related Mr. Griffin's statement that Mr. Jones was in fact

the shooter.   Deputy Bevis attempted to explain the contradiction between pages

one and two, stating: "It was my understanding at the time that Jones was only

going to admit to the crime once Griffin and Goins were out and free.  It was my

understanding that Jones was going—would stand a better chance of getting out of

jail once Griffin and Goins were out."  (C-5 at 323.)[5]  Deputy Bevis said that if his

memory served him, Mr. Eason's belief was that Mr. Jones was the shooter.  (C-5

at 323.)  Deputy Bevis reiterated his independent recollection of Mr. Eason's

statement that Mr. Griffin had confessed to the shooting  (C-5 at 324), noting that

---

[5] It is not clear how this would resolve the contradictory indications in the
memorandum reflecting statements by Mr. Griffin identifying himself (at page
one) and Mr. Jones (at page two) as the shooter.

the statement was at odds with the common perception among law enforcement officers that Mr. Jones was the shooter and noting that this explained Deputy Bevis's ability to recall the statement more than seven years later during the postconviction hearing.  (C-5 at 324.)   Deputy Bevis agreed, however, that the fact that he had written down Mr. Eason's claims regarding Mr. Griffin being the shooter meant that Mr. Eason had in fact made those claims.  (C-5 at 328.)

On cross-examination Deputy Bevis said that he could not recall whether he turned the memorandum over to the state attorney's office (C-5 at 326).  He said he discussed the matter with representatives from the state attorney's office, though this may have been a reference to the escape plan generally rather than the identity of the shooter.  (C-5 at 326-27.)

## B.  State-Court Proceedings

Mr. Jones's filed his initial motion for relief under Florida Rule of Criminal Procedure 3.850 on December 21, 1992, asserting claims not at issue here.  (C-1 at 1.)  Mr. Jones filed a first amended motion with leave of court in January 1994. (C-1 at 32.)  In the state attorney's own words, the *Brady* issue was "embedded in Claim II" of this first amended motion.  The claim was titled ineffective assistance and asserted:

> Additionally, counsel failed to present evidence that codefendant Griffin had told a jail inmate that it was Griffin who shot the police officer.  Either counsel unreasonably failed to discover this information or the State failed to disclose it.  *See Brady v. Maryland*,

> 373 U.S. 83 (1967).  This information was essential to a determination
> of the sentence, particularly in this case where Griffin received a life
> sentence.

C-2 at 206; C-1 at 56, ¶ 46.

Mr. Jones filed a second amended 3.850 motion more than a year later on

October 25, 1996.  (Pet. at 74, ¶ 10.)  The Bevis-memo assertion was again

embedded in claim II, still framed in the same language as an ineffective-assistance

claim or alternatively a *Brady* claim.  (C-1 at 119, ¶ 45).  The second amended

motion also made unrelated *Brady* allegations in claim XIV.  (C-1 at 158-61.)  The

Bevis-memo issue was not included in claim XIV.

Mr. Jones introduced the Bevis memo during the postconviction hearing and

asserted that Mr. Jones's trial attorney had never before seen the document.  (C-4

at 55-58.)  The state's attorney requested a recess to address the issue.  (C-5 at

281.)  The judge asked whether Mr. Jones was asserting a *Brady* violation.  (C-5 at

281-82.)  Mr. Jones's attorney responded by reading the allegation in the first and

second amended 3.850 motions, including the citation to *Brady*.  The judge

expressed concern that this "fairly serious" *Brady* claim was "buried" in claim II.

(C-5 at 284-89.)  The judge concluded that the state had not received fair notice

and gave the state additional time to prepare.  (C-5 at 292-93, 297, 306-07.)  The

hearing resumed the next week.  (C-5 at 311-25.)

After the hearing, the state submitted a memorandum addressing the various

claims then at issue.  The state characterized the Bevis-memo issue as having been "embedded" in claim II and argued the issue on the merits.  (C-2 at 206-08.)[6]

The trial court issued a final order denying Mr. Jones's claim for postconviction relief.  The order began the discussion of the *Brady* issue with an express reference to claim XIV of the second amended motion (C-2 at 230), but the order made no mention of claim II, where the Bevis-memo issue was embedded.  The court noted the state's argument that "the claim" was time barred because Mr. Jones sought leave to amend in October 1993 but failed to proffer the amendment until October 1996.  Mr. Jones responded that he did not receive the relevant records until after 1993, and that his amendment therefore was timely.  None of this dealt with the Bevis-memo issue, which was raised in the first amended motion in 1994, and which was included in claim II, not claim XIV.  The trial court stated that it "might be inclined to accept the defendant's argument on the timeliness of this [*Brady*] claim if there had been a proper sworn allegation" (C-2 at 230), but that "[w]ithout a sworn statement of facts that justify an exception to the time limit

---

[6] The state's post-hearing memorandum is at odds with its current position in this court that "[Mr. Jones] claims he made the *Brady* claim in Claim II of his first amended postconviction motion.  This is incorrect. . . . [T]he first amended postconviction motion alleged the opposite of a *Brady* claim, that is, it alleged that trial counsel knew of the statement . . . ." (Resp. at 82-83.)  The state's postconviction memorandum, in contrast, states under the heading "BRADY Allegation":  "Embedded in Claim II was an allegation of a violation of the dictates of *Brady v. Maryland* . . . ."  (C-2 at 206.)

in rule 3.850(b), the court must consider the claim as untimely." (C-2 at 231.) The court expressly identified this as "an independent ground that is sufficient, standing alone, to justify denial of the claim" and said that "[i]f the court had no other reason, this claim would still be denied on the basis of this state procedural default." (C-2 at 231.)

The trial court also said that if "this claim were not time-barred, it would be denied in any event on the ground that the information was not exculpatory and on the further ground that it was not material." (C-2 at 231.) This was followed by a substantive analysis of the Bevis-memo issue. Because the trial court set out this analysis as an additional, alternative ground for denying the motion, it is obvious that the court deemed the Bevis-memo issue covered by the earlier discussion of untimeliness. Yet the court's untimeliness analysis, if applied to the Bevis-memo issue, was simply wrong.

The trial court's substantive analysis concluded that the Bevis memo was not exculpatory because of the internal contradiction coupled with Mr. Eason's denial that he said Mr. Griffin said Mr. Jones was the shooter. (C-2 at 231.) The trial court also concluded that the Bevis memo was not material because it was hearsay and "[a]t best, it could only have been used to impeach the testimony of Kevin Eason, and that testimony would not have been admitted against the defendant in any event." (C-2 at 232.)

On appeal the Florida Supreme Court upheld both the procedural-default ruling and the alternative substantive ruling.  The court quoted the trial court's untimeliness analysis at length and observed: "We find no error in this ruling." *Jones II*, 732 So. 2d at 321-22.  The court also quoted the trial court's alternative substantive analysis at length and said it "agree[d] with the trial court's legal analysis of this issue."  *Id.* at 322.

### C.  *Procedural Default*

A federal court ordinarily "will not review a question of federal law decided by a state court if the decision of that court rests on a state law ground that is independent of the federal question and adequate to support the judgment." *Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  This is so even if the state court renders an *alternative* holding based on federal law:

> [A] state court need not fear reaching the merits of a federal claim in an *alternative* holding.  By its very definition, the adequate and independent state ground doctrine requires the federal court to honor a state holding that is a sufficient basis for the state court's judgment, even when the state court also relies on federal law.

*Harris v. Reed*, 489 U.S. 255, 264 n.10 (1989) (emphasis in original).

The Florida Supreme Court's decision rested on an independent state ground.  The decision quoted at length and explicitly approved the trial court's procedural-default analysis.  *See Jones II*, 732 So. 2d at 321-22.  The trial court labeled that analysis "an independent ground that is sufficient, standing alone, to

justify denial of the claim."  (C-2 at 231.)  The state-court decision thus satisfies

the "independent" aspect of the independent-and-adequate-state-ground doctrine.

But the Florida Supreme Court decision did not rest on an *adequate* state

ground.  The trial court's stated ground for deeming the Bevis-memo claim

untimely simply did not apply to that issue.  Only as a result of the confusion

between claims II and XIV did the trial court deem the Bevis-memo claim

untimely.  The Supreme Court's adoption of the trial court's reasoning was

inadequate for the same reason.  Mr. Jones did not procedurally default this claim.

### D.  Merits

The inadequacy of the state ground does not mean that Mr. Jones is entitled

to relief.  It means only that this court must address the merits.

### 1. *Brady* Standard

In *Brady v. Maryland*, 373 U.S. 83 (1963), the Supreme Court held that "the

suppression by the prosecution of evidence favorable to an accused upon request

violates due process where the evidence is *material* to guilt or to punishment . . . ."

*Id.* at 87 (emphasis added).  A *Brady* violation thus occurs only if suppressed

evidence "is of sufficient significance to result in the denial of the defendant's right

to a fair trial."  *United States v. Bagley*, 473 U.S. 667, 675-76 (1985) (quoting

*United States v. Agurs*, 427 U.S. 97, 108 (1976)).  *Bagley* also said:

> The evidence is material only if there is a reasonable probability that,
> had the evidence been disclosed to the defense, the result of the

> proceeding would have been different.  A "reasonable probability" is a
> probability *sufficient to undermine confidence in the outcome*.

*Id.* at 682 (emphasis added).  *Bagley* also made clear that both exculpatory and

impeachment evidence are within *Brady*'s ambit.  *See id.* at 676.

In *Kyles v. Whitley*, 514 U.S. 419 (1995), the Supreme Court again

addressed the materiality standard.  *Kyles* set out four aspects of materiality, two of

which are important here.  First, to establish materiality, a petitioner need not prove

that the disclosure would have resulted in an acquittal.  The question instead is

whether, in the absence of the disclosure, the petitioner "received a fair trial,

understood as a trial resulting in a verdict worthy of confidence."  *Id.* at 434.

Second, a petitioner "need not demonstrate that after discounting the inculpatory

evidence in light of the undisclosed evidence, there would not have been enough

left to convict."  *Id.* at 434-35.  Rather, a petitioner must show "that the favorable

evidence could reasonably be taken to put the whole case in such a different light

as to undermine confidence in the verdict."  *Id.*[7]

### 2. *Brady* Analysis

The state trial court's alternative holding addressed the *Brady* claim on the

merits.  The Florida Supreme Court adopted the trial court's opinion by reference,

---

[7] The third *Kyles* principle is that if a reviewing court finds a *Brady*
violation, it may not deem the violation harmless.  The fourth is that in determining
materiality, the evidence is considered collectively, not item by item.  These
principles make no difference here.

saying, "The record supports the trial court's factual findings. We agree with the trial court's legal analysis of this issue and, therefore, affirm this ruling." *Jones II*, 732 So. 2d at 322. The ruling is entitled to the same deference as a nonalternative ruling explained at greater length. *See* 28 U.S.C. § 2254(d) (making the deferential review standard applicable on "any claim that was adjudicated [by the state court] on the merits"). And this is so despite the state courts' erroneous procedural ruling; that ruling had nothing to do with the alternative ruling on the merits.

The trial court correctly identified *Brady* as the controlling authority and accurately summarized the governing standards. (C-2 at 231.) The court described the Bevis memo, concluded that it constituted hearsay, and noted that "even if it could be admitted into evidence it would not be exculpatory to the defendant." (C-2 at 232.) In so concluding, the court cited the inconsistencies in the statements the memo attributed to Mr. Eason—that he had in turn identified Mr. Griffin or Mr. Jones as the shooter.

The trial court also noted Mr. Eason's testimony that he never told Deputy Bevis that Mr. Griffin identified himself as the shooter. On that view the memo merely reflected a misunderstanding of Mr. Eason's statements to Deputy Bevis. The trial court concluded that the Bevis memo "is not material to any issue in the case. At best it could only have been used to impeach the testimony of Kevin Eason, and the testimony would not have been admitted against the defendant in

any event." (C-2 at 232.) The Florida Supreme Court adopted this analysis.

The state court's analysis was reasonable and consistent with federal law. Mr. Jones concedes that "[i]t is not clear whether this information would have been admissible at the guilt phase of the trial," but he urges its admissibility during the penalty phase "where hearsay can be admitted." (Pet. at 71, ¶ 6 (citing Fla. Stat. § 921.141(1))). Mr. Jones's trial attorney said that had he known of the memo, he would have called Mr. Eason as a witness and, regardless of his testimony, would have impeached the testimony using Deputy Bevis.[8]

Mr. Eason's postconviction-hearing testimony made clear that had he been called during the penalty phase, he would have testified that Mr. Griffin told him that Mr. Jones shot the officer (C-5 at 312-13); that Mr. Griffin never said that he himself shot the officer (C-5 at 313-14); and that Mr. Eason never told Deputy Bevis otherwise. (C-5 at 314-15.) At best, Deputy Bevis—consistent with his postconviction-hearing testimony—would have said he understood that Mr. Eason thought Mr. Jones was the shooter. (C-5 at 323 ("[I]t was Eason's understanding

---

[8] It is not clear that this would have been permitted at the time. Prior to October 1990, under the old "voucher rule," the party calling a witness could not attack that witness's credibility by prior inconsistent statements or by calling other witnesses to prove that material facts were other than as testified to by the witness being impeached. *See* Fla. Stat. § 90.608 (1989); *see generally* Charles W. Ehrhardt, *Florida Evidence* § 608.2 at 467-68 (2003). But the evidence rules may be relaxed in a trial's penalty phase. *See* Fla. Stat. § 921.141 (1989). I assume for present purposes that this tactic would have been permitted.

that Jones was the actual trigger man.").)  Deputy Bevis also would have testified

that he walked away from his interview with Mr. Eason under the impression that,

despite an inconsistent statement, Mr. Griffin identified Mr. Jones as the shooter.

(C-5 at 324 ("Q: Your final understanding, however, as to who Griffin was saying

pulled the trigger was who?  A: Mr. Jones.").)  Mr. Bevis and Mr. Eason thus

ultimately would have testified consistently with one another that whatever the

memo said, both believed Mr. Jones was the shooter.  The jury would have had, on

one hand, an internally inconsistent hearsay memo and, on the other hand, two

witnesses—including a law enforcement officer—agreeing that Mr. Jones was the

shooter.  And this was consistent with the testimony of Ms. Harris, who was at the

scene of the shooting and testified that Mr. Jones was the shooter.  (A-19 at 2393-

99.)

　　　　Moreover, any suggestion that Mr. Griffin was the shooter would have been

entirely inconsistent with Mr. Jones's own trial testimony.  Mr. Jones testified that

Ms. Harris arranged a meeting with a drug dealer who was to trade crack cocaine

for the guns that Mr. Jones and his fellow escapees were carrying.  (A-23 at 3009.)

Mr. Jones claimed that the drug dealer shot the officer and that Mr. Griffin was

asleep in the back seat of the car when the shooting began:

> Q:　From the time you parked [the car].  All right.  During the time
>      that they [the police and Mr. Goins and Ms. Harris] were
>      talking, did anything happen?

A:      Yes, sir.

Q:      What?

A:      The guy that she [Harris] had brung, he had got up and shot the police.

Q:      Where were you at that point?

A:      Still sitting in the back.

Q:      What did you do at that time?

A:      I hit Mr. Griffin and said, "Come on, man, let's go."  He was asleep. He didn't know what was going on.

(A-23 at 3012-13.)  Mr. Jones reiterated this version of events on cross-examination.  (A-23 at 3108-09.)

Neither the record nor common sense suggests that Mr. Jones would not have given this testimony had the Bevis memo been disclosed prior to trial.  To his credit, Mr. Jones has made no such suggestion.  He has not asserted that he lied on the stand but would not have done so had he known of the Bevis memo.

In sum, the failure to disclose the Bevis memo prior to trial is insufficient to undermine confidence in the trial's outcome.  Under all the circumstances, the Bevis memo was not material within the meaning of *Brady*.  And even more clearly, the state courts' conclusion that the memo was not material was not contrary to or an unreasonable application of federal law as established by the United States Supreme Court or based on an unreasonable determination of the facts in light of the evidence.  Mr. Jones is not entitled to relief on this claim.

## Claim III: Ineffective Assistance on Appeal

In claim III Mr. Jones asserts that his attorney rendered ineffective assistance on the direct appeal.  The claim cites the attorney's failure to challenge on appeal four rulings: (1) the introduction of testimony on the details of the prison escape and photographs of Mr. Jones and the others with guns (Pet. at 85-94); (2) the refusal to sever Mr. Jones's trial from Mr. Griffin's (Pet. at 95-101); (3) the introduction of autopsy photographs (Pet. at 102-05); and (4) the prosecutor's allegedly improper argument in the penalty phase.  Mr. Jones seeks a new direct appeal.  (Pet. at 105-14.)

### A.  *Procedural History & Standard of Review*

Mr. Jones raised each of these claims in a state-court petition for habeas corpus.  This is the appropriate procedure in Florida for raising a claim of ineffective assistance of appellate counsel.  *See Clark v. Crosby*, 335 F.3d 1303, 1306 n.3 (11th Cir. 2003).  His claims were analyzed and adjudicated on the merits.  *See Jones III*, 794 So. 2d at 583-90 & 583 n.5.

*Strickland* governs a claim of ineffective assistance of appellate counsel.  To prevail, a petitioner must "show that his lawyer's performance fell below an 'objective standard of reasonableness' and that the lawyer's deficient performance prejudiced the petitioner."  *Van Poyck,* 290 F.3d at 1322 (quoting *Strickland*, 466 U.S. at 688).

## B.  Details of the Prison Escape and Photographs of Guns

First, Mr. Jones asserts that the attorney should have challenged on appeal the trial court's admission of the testimony by Antoine Garrett, a correctional officer at the Maryland facility from which Mr. Jones and his cohorts escaped some two weeks before the murder.  Mr. Garrett described the escape, noting that Mr. Griffin pulled a knife on Mr. Garrett and threatened to kill him if he alerted anyone.  (A-19 at 2553-54.)  The trial court admitted the evidence to show the defendants' state of mind, intent, and motive.  (A-19 at 2544-45.)

Second, Mr. Jones asserts the attorney should have challenged on appeal the admission of photographs found in the car occupied by Mr. Jones and the others at the time of the shooting.  The photographs showed Mr. Jones and the others displaying weapons identical to those found at the crime scene and the one used to kill the officer.  (A-17 at 2084-2100.)  The state argued that the photographs not only demonstrated the defendants' possession of weapons identical to those used in the crime, but that the photographs did not show anyone not present at the time of the shooting (Mr. Jones, Mr. Griffin, Mr. Goins, and Ms. Harris), thus undermining the defense theory that a stranger committed the crime.  The trial court excluded photographs showing the defendants brandishing machine guns not used in the crime.  (A-17 at 2098.)  But the court admitted the remaining photographs while requiring the redaction of inscriptions.  (A-17 at 2095-96, 2100.)

On habeas review, the Florida Supreme Court applied a standard that "mirror[ed] the *Strickland* standard for trial counsel ineffectiveness." *Jones III*, 794 So. 2d at 583 (citation omitted). The court first addressed the second prong of *Strickland*—prejudice— reasoning that if the trial court did not err in overruling Mr. Jones's attorney's objections, then the failure to raise the rulings on appeal could not violate *Strickland*. *See id.* at 583-84; *see also Strickland*, 466 U.S. at 697 ("If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed."). The Florida Supreme Court reviewed the trial court's rulings for abuse of discretion, just as it would have done in Mr. Jones's direct appeal had the issues been raised. *See id.* at 584. The Florida Supreme Court held as a matter of state law that the trial court did not abuse its discretion in admitting the escape evidence and the photographs. *See id*. at 585. The Florida Supreme Court also said that even had the admission of the evidence been erroneous, the error would have been harmless. *See id*. The Florida Supreme Court concluded that relief would not have been granted had Mr. Jones challenged the trial court's rulings on appeal, so the claim that the appellate attorney rendered ineffective assistance did did not satisfy *Strickland*'s prejudice prong. The Florida Supreme Court's interpretation of state evidentiary law cannot be challenged here. *See, e.g.*, *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990).

The prejudice ruling was plainly correct.  The Florida Supreme Court—the court that decided the direct appeal and would have addressed these issues had they been raised on direct appeal—concluded that the trial court's introduction of the evidence was not erroneous.  Failing to raise the issues thus caused no prejudice.  Mr. Jones is not entitled to relief on this claim.

This apparently does not end the matter, however.  Mr. Jones's state and federal habeas petitions go on to argue that the introduction of this evidence "deprived [him] of due process," (Pet. at 92, ¶ 15), and that the attorney's failure to raise the due-process issue on appeal constituted ineffective assistance.  Mr. Jones cites no similar cases from the United States Supreme Court and instead relies almost exclusively on state-law *Williams*-rule cases.  (Pet. at 91-94.)[9]

The due-process argument fails to account for the introduction of the evidence for purposes other than showing bad character or propensity.  *See generally* Charles W. Ehrhardt, *Florida Evidence* § 404.9 at 194 (2003) ("Evidence of other crimes, wrongs and acts is admissible if it is relevant because it is probative of a material issue other than the bad character or propensity of an individual."). This evidence was relevant to substantive issues: the escape was a motive to kill the officer and the photograph of the gun showed a means to do so, or so a reasonable

---

[9] *See Williams v. State*, 110 So. 2d 654 (Fla. 1959) (recognizing the inadmissibility of similar-act evidence if relevant only to prove bad character or propensity); *see also* Fla. Stat. § 90.404(2)(a) (codifying *Williams*).

juror could conclude.  Moreover, this court may not second-guess the Florida

Supreme Court's adjudication on state-law evidentiary issues on federal habeas

review.  *See, e.g.*, *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991) ("Today, we

reemphasize that it is not the province of a federal habeas court to reexamine state-

court determinations on state-law questions.").  The Florida Supreme Court

concluded not only that the trial court had not abused its discretion but that its

ruling was correct.  *Jones III*, 794 So. 2d at 585.

More importantly, the admission of this evidence did not deny Mr. Jones a

fair trial.  *See*, *e.g.*, *Williams v. Kemp*, 846 F.2d 1276, 1281 (11th Cir. 1988)

(holding that a state evidentiary error justifies habeas relief only when there is a

"denial of fundamental fairness").  Leaving aside the relevance of this evidence on

substantive issues, the Supreme Court has explicitly left open the question whether

admitting evidence solely to show bad character or propensity violates a

defendant's due-process rights.  *See Estelle*, 502 U.S. at 75 n.5 ("Because we need

not reach the issue, we express no opinion on whether a state law would violate the

Due Process Clause if it permitted the use of 'prior crimes' evidence to show

propensity to commit a charged crime.").  A ruling admitting bad-character or

propensity evidence, at least in the absence of other circumstances, thus is not

contrary to or an unreasonable application of federal law as determined by the

United States Supreme Court.  Mr. Jones is not entitled to relief on this claim.

### C . Severance

Mr. Jones and Mr. Griffin were tried jointly.  Mr. Jones's attorney moved on several occasions for severance.  (A-12 at 1425; A-19 at 2510-12; A-21 at 2749, 2762, 2797.)  The trial court denied the motion each time.  Mr. Jones claims that his appellate attorney rendered ineffective assistance in failing to challenge these rulings.

Mr. Jones's trial attorney sought severance on two theories.  First, the state sought to present evidence that Mr. Griffin attempted to murder a police officer in 1978.  Mr. Jones's attorney objected on relevance and asserted that Mr. Jones would be entitled to a severance if the evidence was admitted against Mr. Griffin. (A-21 at 2749, 2762.)  The trial court admitted the evidence with a limiting instruction.  (A-21 at 2754-55.)  Mr. Jones asserted on direct appeal that the trial court erred by admitting this evidence.  (B-1 at 24-25.)  The Florida Supreme Court disagreed.  *Jones I*, 580 So. 2d at 146.  On habeas review, the Florida Supreme Court rebuffed Mr. Jones's effort to recast the issue as an ineffective-assistance claim:

> Jones's direct appeal argument on this point was at its core an
> argument for severance.  On direct appeal, appellate counsel argued
> *Crum v. State* and *Rowe v. State* in support of appellate counsel's point
> on appeal.  These cases concern severance.  In this habeas petition,
> Jones argues the same *Crum* and *Rowe* cases to support collateral
> counsel's argument that Jones's appellate counsel was ineffective for
> failing to raise the severance claim on direct appeal.  This Court
> previously has made clear that habeas is not proper to argue a variant

to an already decided issue.

*Jones III*, 794 So. 2d at 586 (citations omitted).

The Florida Supreme Court's ruling on direct appeal, as embraced again on habeas corpus, made clear that the appellate attorney did not render ineffective assistance. To the contrary, the attorney properly presented the issue on direct appeal; he simply lost the issue on the merits. And even more clearly, the Florida Supreme Court's ruling confirmed that even had the attorney rendered ineffective assistance by failing to properly present the issue, Mr. Jones would have suffered no prejudice, because the Florida Supreme Court would have rejected the severance claim on the merits.

Mr. Jones's second argument for severance in the trial court was that Mr. Griffin's trial strategy implicated Mr. Jones, so that he was "caught between both the State and a Co-defendant, both pointing a loaded gun in [his] direction." (A-21 at 2799.) The trial court denied the motion to sever, noting that Mr. Griffin's attorney had done nothing more than demonstrate the absence of evidence implicating Mr. Griffin. (A-21 at 2800.) On habeas review the Florida Supreme Court agreed with the trial court's reasoning. The Florida Supreme Court concluded that because the trial court did not abuse its discretion in denying the motion to sever, Mr. Jones could not have prevailed on direct review, so the appellate attorney's failure to raise the issue could not satisfy the *Strickland*

prejudice standard.  *Jones III*, 794 So. 2d at 586-87.

In this proceeding Mr. Jones again asserts that his appellate attorney's failure to raise this issue constituted ineffective assistance.  But Mr. Jones fails to come to grips with the Florida Supreme Court's prejudice analysis.  Instead, Mr. Jones cites the same authorities, *Crum* and *Rowe*, essentially arguing that the state courts got it wrong.  To the extent based on state law, the argument is not cognizable in a federal habeas proceeding.  *See Estelle*, 502 U.S. at 68.  Perhaps recognizing this, Mr. Jones says the "trial court abused its discretion in denying the motions for severance" and that this "deprived Mr. Jones of a fair trial."  (Pet. at 100, ¶ 29.)  But Mr. Jones cites no federal law in support of the assertion.  The failure to sever the codefendants' trials was not a due-process violation.  And even more clearly, the Florida Supreme Court's ruling was not contrary to or an unreasonable application of federal law as established by the United States Supreme Court.  Mr. Jones is not entitled to relief on this claim.

### D.  *Autopsy Photographs*

Mr. Jones next asserts his attorney should have challenged on appeal the admission of autopsy photographs.  The trial court admitted three photographs over objection.  The Florida Supreme Court held that each was properly admitted so that had the issue been raised on appeal, Mr. Jones would not have prevailed.  The court rejected the ineffective-assistance claim based on the *Strickland* prejudice standard.

Mr. Jones's petition cites no federal law and makes no federal claim with respect to the admission of these three photographs.  (Pet. at 102-05.)  The admission of the photographs was treated and disposed of as a matter of state evidentiary law.  Mr. Jones may not challenge the Florida Supreme Court's interpretation of state law.  *See Estelle*, 502 U.S. at 68.  In any event, the Florida Supreme Court's ruling was not contrary to or an unreasonable application of federal law or based on an unreasonable determination of the facts.  Mr. Jones is not entitled to relief on this claim.

### E.  The Prosecutor's Closing Arguments

Mr. Jones's final claim of ineffective assistance on appeal addresses the prosecutor's penalty-phase closing argument.  (Pet. at 105-14.)  Mr. Jones contends that the argument included "irrelevant, inflammatory, and prejudicial appeals to the jury's passions and prejudices" and that the prosecutor urged the jury to disregard the mitigating evidence, including by saying, "We're not interested in his past." (Pet. at 105-07, ¶ 41.)  Mr. Jones's trial attorney did not object at the time.  But even without a contemporaneous objection, a defendant may challenge an improper closing that constitutes fundamental error.  *See Kilgore v. State*, 688 So. 2d 895, 898 (Fla. 1996).  In a penalty phase this means that the comments are "so prejudicial as to taint the jury's recommended sentence."  *Thomas v. State*, 748 So. 2d 970, 985 n.10 (Fla. 1999).

The Florida Supreme Court applied the standard of review that would have been applied on a direct appeal, determined that no error occurred, and denied relief because Mr. Jones suffered no prejudice from the appellate attorney's failure to raise this issue on direct appeal.  *See Jones III*, 794 So. 2d at 589.  Mr. Jones asserts in effect that the Florida Supreme Court erred as a matter of state law.  (Pet. at 110-14, ¶¶ 46-50.)  This is not a basis for federal habeas relief.  *See Estelle*, 502 U.S. at 68.

Mr. Jones also says the prosecutor's remarks violated the Eighth and Fourteenth Amendments.  (Pet. at 108-10, ¶¶ 43-45.)  Mr. Jones made this assertion in his state habeas petition (E-1 at 23-25), and the Florida Supreme Court rejected it, concluding that no error occurred.  Mr. Jones now correctly notes that a prosecutor's closing argument may rise to the level of a constitutional violation.  But this one did not.  No United States Supreme Court decision comes close to suggesting the contrary.  The Florida Supreme Court's rejection of this claim was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court.[10]

---

[10] To be sure, Mr. Jones cites a number of *circuit-court* decisions on this issue.  But even had the cited cases been decided by the United States Supreme Court, Mr. Jones's claim would fail.  None of the cited cases addressed closing-argument comments remotely analogous to those at issue here.  *See Cunningham v. Zant*, 928 F.2d 1006 (11th Cir. 1991) (prosecutor said he was "offended" that the defendant exercised his Sixth Amendment right to a jury trial, questioned whether the defendant even had such a right, and "made numerous appeals to religious

### F. Conclusion

The state courts' rejection of Mr. Jones's ineffective-assistance-of-appellate-counsel claims was not contrary to or an unreasonable application of federal law as determined by the United States Supreme Court or based on an unreasonable determination of the facts in light of the evidence.  Mr. Jones is not entitled to relief on this claim.

### Claim IV: The Trial Judge's Mitigation Ruling

In claim IV Mr. Jones alleges constitutional error in the trial judge's failure to find mitigating factors despite allegedly unrebutted mitigation evidence.  Mr. Jones asserts that the Florida Supreme Court erred when, on direct review, it deferred to the trial judge's findings on mitigation.

### A. Procedural History

---

symbols and beliefs" including an analogy to Judas Iscariot) (dictum); *Wilson v. Kemp*, 777 F.2d 621 (11th Cir. 1985) (prosecutor read from an 1873 decision squarely at odds with the current death-penalty statute and quoted from a another decision in a misleading fashion); *Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) (prosecutor quoted from two 100 year-old cases and thus may have misled the jury on the law); *Potts v. Zant*, 734 F.2d 526 (11th Cir. 1984) (prosecutor read from an old state case "attempting to suggest to the jury that prior decisions of the state supreme court mandated the imposition of the death penalty"), *vacated on other grounds*, 478 U.S. 1017 (1986); *see also Newlon v. Armontrout*, 885 F. 2d 1328 (8th Cir. 1989) (prosecutor expressed his personal belief that the defendant deserved the death penalty more than any other he had seen as the "top law enforcement officer of the County," compared the defendant to infamous mass murderers, analogized to the jurors' self-defense of their own children, and reassured the jury that appellate review would follow).

During the penalty phase, Mr. Jones presented evidence of his deprived childhood, his drug and alcohol abuse, his expressions of remorse, his borderline intelligence, his efforts to improve himself by obtaining a GED, his low self-esteem, and his HIV.  (A-26 at 3440-46.)  When announcing the sentence, the trial judge said he "looked independently through the entire record of the proceedings" in search of "non-statutory mitigating circumstances . . . ."  (A-27 at 3616.)  The judge said he

> considered carefully the testimony that the psychologist [Annis] gave about your upbringing and your family life, that your father died when you were twelve, that your mother remarried a man who was reportedly a child abuser, that your brother died while you were very young, and that your mother died also when you were very young; that you got involved with drugs and that you experienced what the psychologist described as a feeling of helplessness.

(A-27 at 3616-17.)  The judge concluded:

> Although there is no question but that these things worked to your disadvantage, and I don't doubt that, and there is [no] question but that these things perhaps explain why you found yourself in the situation that you were in; but in no sense, sir, do I find that they excuse or mitigate the acts that you have committed in this case.
>
> As I say, I have searched hard to find a reason to extend mercy, but under the circumstances of the case I regret to say I cannot do that.

(A-27 at 3617; *see also* Sentencing Order A-1, unnumbered, ¶ 7.)

Point VII of Mr. Jones's direct appeal claimed that the death penalty ought not be imposed because of his low IQ and "inability to function in society."  The entire argument read:  "Appellant's problems stemming from drugs, alcohol, and

having to deal with the death of those around him make [imposition of a death

sentence] a violation of the 8th and 14th Amendments to the constitution of the

United States." The Florida Supreme Court said:

> The [trial] court found that none of the statutory mitigating
> circumstances applied and, after carefully examining the nonstatutory
> mitigating evidence, found that no mitigators had been established.
> Jones argues that the court should have found statutory and
> nonstatutory mitigators, but "[t]he resolution of factual conflicts is
> solely the responsibility and duty of the trial judge, and, as the
> appellate court, we have no authority to reweigh that evidence."
> Although cultural deprivation and a poor home environment may be
> mitigating factors in some cases, sentencing is an individualized
> process. We cannot say the trial court erred in finding the evidence
> presented insufficient to constitute a relevant mitigating circumstance.
> Therefore, the trial court's conclusion that death is the appropriate
> penalty in this case is affirmed.

*Jones I*, 580 So. 2d at 146 (citations omitted).[11]

In claim IV of the federal petition Mr. Jones begins by surveying Florida law

on nonstatutory mitigators. (Pet. at 117-18, ¶ 5.) He then argues that the trial judge

"made an erroneous conclusion of law that these facts did not establish mitigating

factors." (Pet. at 119, ¶ 6.) This is an unfair characterization of the trial judge's

---

[11] Mr. Jones also raised this issue in his state habeas proceeding. (E-1 at 29-
34.) The Florida Supreme Court held that the claim was procedurally barred from
state habeas review because it was "adversely decided against Jones on direct
appeal." *Jones III*, 794 So. 2d at 583 n.6. The issue has been preserved for federal
habeas review. *See Davis v. Singletary*, 119 F.3d 1471, 1479 (11th Cir. 1997)
("Once a state supreme court on direct review has . . . based its disposition solely
on a rejection of the merits of a claim, no amount of procedural bar holding as to
that claim in further proceedings will suffice to bar the claim from federal habeas
review.")

ruling.  And in any event, to the extent Mr. Jones's assertion is that the trial judge

erroneously interpreted state law, the Florida Supreme Court's rejection of the

assertion is binding here.  *See Estelle*, 502 U.S. at 68.

Mr. Jones does raise two constitutional arguments.  The first concerns the

trial judge's purportedly erroneous "definition" of mitigating factors and, by

implication, the Florida Supreme Court's failure to rectify that constitutional error.

The second concerns the standard of review applied by the Florida Supreme Court.

### B.  *The Trial Judge's Consideration of Mitigation*

Mr. Jones first argues that the trial judge defined mitigation in a way that

violated the Eighth and Fourteenth Amendments as interpreted by the United States

Supreme Court.  (Pet. At 120, ¶ 8 ("The trial court's definition of mitigation is

contrary to *Lockett v. Ohio* . . . .  Mitigating factors can be anything in the life of the

defendant which might militate against the appropriateness of the death

penalty . . . .")); (Pet. at 121, ¶ 11 ("Since recognized mitigating factors were

proved . . . the sentencers were required by the United States Constitution and

Florida law to weigh them against the aggravating factors . . . ." (citing *Lockett v.*

*Ohio*, 438 U.S. 586 (1978) (plurality opinion); *Hitchcock v. Dugger*, 481 U.S. 393

(1987); *Eddings v. Oklahoma*, 455 U.S. 104 (1982))).

In *Lockett* a state statute allowed consideration of only three specific statutory

mitigators.  The statute precluded consideration of nonstatutory factors such as

"character, prior record, age, lack of specific intent to cause death, and [one's]

relatively minor part in the crime." *Id.* at 597.  A plurality of the Supreme Court

framed the issue as whether the Eighth and Fourteenth Amendments "require that

the sentencer, in all but the rarest kind of capital case, not be precluded from

*considering* as a mitigating factor, any aspect of a defendant's character or record

and any circumstances of the offense that the defendant proffers as a basis for a

sentence less than death." *Id.* at 604 (emphasis added) (footnotes omitted).  The

plurality found the Ohio statute unconstitutional because it prohibited "the type of

individualized *consideration* of mitigating factors we now hold to be required by

the Eighth and Fourteenth Amendments in capital cases." *Id.* at 606 (emphasis

added); *see also Woodson v. North Carolina*, 428 U.S. 280, 304 (1976) (plurality

opinion) ("[I]n capital cases . . . the Eighth Amendment . . . requires *consideration*

of the character and record of the individual offender and the circumstances of the

particular offense . . . ." (emphasis added));  *Williams v. Oklahoma*, 358 U.S. 576,

585 (1959) ("In discharging his duty of imposing a proper sentence, the sentencing

judge is authorized, if not required, to *consider* all of the mitigating and aggravating

circumstances involved in the crime." (emphasis added)).

    *Lockett* thus establishes that in a capital case, a judge ordinarily may not be

precluded from *considering* in mitigation a defendant's character, record, and role

in the offense.  Mr. Jones presented such evidence to the penalty-phase jury, and the

trial judge "considered carefully" all such evidence, saying he "looked independently through the entire record" in that regard.  (A-27 at 3616.)  This fully comported with *Lockett*.

The two other Supreme Court cases that Mr. Jones cites add nothing to the analysis.  As in *Lockett*, the Court in *Hitchcock v. Dugger*, 481 U.S. 393 (1987), confronted a claim that "the advisory jury and the sentencing judge were precluded by law from considering some of the evidence of mitigating circumstances before them."  *Id.* at 395.  The trial judge specifically stated that he considered only "certain enumerated" mitigating circumstances—those indicated in the statute.  *Id.* at 398 (emphasis omitted).  The Supreme Court concluded that "it could not be clearer that the advisory jury was instructed not to consider, and the sentencing judge refused to consider, evidence of nonstatutory mitigating circumstances . . . ."  *Id.* at 398-99 (citing *Skipper v. South Carolina*, 476 U.S. 1 (1982) (finding constitutional error in the exclusion of nonstatutory mitigation testimony)).  As in *Lockett*, the only issue addressed by the Court was the constitutionality of a scheme that prohibited consideration of nonstatutory mitigators.  Similarly, in *Eddings v. Oklahoma*, 455 U.S. 104 (1982), the Court reviewed a capital sentence in which the trial judge "would not consider in mitigation the circumstances of Eddings' unhappy upbringing and emotional disturbance . . . ."  *Id.* at 109.  The trial judge said: "Nor can the Court in following the law, in my opinion, *consider* the fact of

this young man's violent background." *Id.* (emphasis added).  "[B]y 'violent

background' the trial judge was referring to the mitigating evidence of Eddings'

family history." *Id.* at 113.  The trial judge who sentenced Mr. Jones said nothing

of the kind.

To be sure, although he considered all the mitigating circumstances, the trial

judge did not label them "mitigating factors."  But what matters under the

Constitution and such cases as *Lockett*, *Hitchcock*, and *Eddings* is not the label

attached to the factors but whether the trial judge fully considers them in

determining the sentence.  The judge's comments here make abundantly clear that

he fully considered the entire record and all the circumstances, trying—but

failing—to find a reason to impose a sentence other than death.  Thus the judge

found the circumstances insufficient to "extend mercy" to Mr. Jones.  (A-27 at

3616, 3617.)  In essence, the trial judge found the circumstances *insufficiently*

mitigating to change the outcome.  The Florida Supreme Court's conclusion that the

trial court's analysis fully comported with the governing constitutional standards

was not contrary to or an unreasonable application of federal law as determined by

the United States Supreme Court.  Mr. Jones is not entitled to relief on this claim.

### C.  Appellate Review

Mr. Jones's second constitutional argument is that the Florida Supreme Court

erred in "fail[ing] to independently review the record for the existence of

mitigation."  (Pet. at 121, ¶ 10 (citing *Parker v. Dugger*, 498 U.S. 308 (1991))).

In *Parker* the defendant presented evidence of a difficult childhood, a positive relationship with his own children and neighbors, and drug and alcohol consumption at the time of the murder of which he was convicted.  *Id.* at 314.  The trial judge sentenced the defendant to death.  The judge "did not discuss evidence of, or reach any explicit conclusions concerning, nonstatutory mitigating evidence," but declared that "[t]here are no mitigating circumstances that outweigh the aggravating circumstances . . . ."  *Id.* at 311.  On review, the Florida Supreme Court upheld the death sentence, erroneously saying that the trial court "found no mitigating circumstances to balance against the aggravating factors." *Id.* at 318.  The United States Supreme Court reversed, saying, "The Florida Supreme Court erred in its characterization of the trial judge's findings, and consequently erred in its review of Parker's sentence."  *Id.*  The Court continued, "What the Florida Supreme Court could not do, but what it did, was to ignore the evidence of mitigating circumstances in the record and misread the trial judge's findings regarding mitigating circumstances, and affirm the sentence based on a mischaracterization of the trial judge's findings."  *Id.* at 320; *see also id.* at 321 ("The Florida Supreme Court affirmed Parker's death sentence neither based on a review of the individual record in this case nor in reliance on the trial judge's findings based on that record, but in reliance on some other nonexistent findings.").

There was no similar error here.  The trial judge specifically identified and discussed the mitigation evidence but found it not to be mitigating in fact—that is, not to change the conclusion that under all the circumstances the proper sentence was death.  On direct review the Florida Supreme Court correctly observed that the trial judge "examin[ed] the nonstatutory mitigating evidence [but] found no mitigators had been established."  *Jones I*, 580 So. 2d at 146.  This is "very different" from *Parker*, as the United States Supreme Court itself recognized: "[I]f the trial judge had found no mitigating circumstances and the Florida Supreme Court had relied on that finding, our review would be very different."  *Parker*, 498 U.S. at 322.  Mr. Jones is not entitled to relief on this claim.

### D.   *Conclusion*

A judge considering a death sentence must consider any mitigating evidence; the judge may not fail or refuse to do so.  The record in this case shows that the sentencing judge fully considered the mitigating evidence but concluded that the proper sentence was death.  The Florida Supreme Court properly reviewed this determination on the merits, relying, as it was entitled to do, on the trial judge's express analysis and findings.  The state courts' rulings were not contrary or an unreasonable application of federal law and were not based on an unreasonable determination of the facts in light of the evidence.  Mr. Jones is not entitled to relief on this claim.

## Claims V and VI: Aggravating Factors

Claims V and VI are closely related.  In claim V Mr. Jones asserts that the trial court improperly instructed the penalty-phase jury on two aggravating factors that were legally inapplicable.  (Pet. at 123-32.)  In claim VI Mr. Jones asserts that on direct appeal the Florida Supreme Court was constitutionally obligated—but failed—to do one of two things to address the trial court's improper instructions: either reweigh the aggravating and mitigating factors after eliminating the inapplicable factors, or conduct a harmless-error analysis.   On direct appeal the Florida Supreme Court did not explicitly address the improper-instruction claim. On collateral review the Florida Supreme Court held these claims procedurally barred and alternatively rejected on the merits the claim that it did not properly resolve Mr. Jones's instructions claim on direct appeal.

### A.  *Procedural History*

*Trial-Court Proceedings.*  The evidence at trial established that after the shootout, Mr. Jones took possession of Officer Ponce de Leon's service weapon. Mr. Jones and Mr. Griffin fled into a nearby neighborhood.  Among the aggravators on which the court instructed the penalty-phase jury were these: whether "the defendant in committing the crime for which he is to be sentenced, knowingly created a great risk of death to many persons," and whether "the crime for which the defendant is to be sentenced was committed while he was engaged in the

commission of the crime of robbery."  (A-26 at 3538.)  Mr. Jones objected.  (A-26 at 3500-01.)

The jury recommended death but, in accordance with Florida law, did not identify the aggravators on which it relied.  Three aggravators were indisputable: Mr. Jones was under a sentence of imprisonment at the time of the murder; he had been convicted of violent felonies in the past; and Officer Ponce de Leon was a law enforcement officer engaged in his official duties.  The evidence was easily sufficient to support a fourth aggravator: the murder was committed for the purpose of avoiding or preventing a lawful arrest or effecting or continuing escape from custody.  The trial judge entered a written death sentence finding these four aggravators and one more: the murder occurred during the commission of a robbery.  (A-1, Sentencing Order, unnumbered, "Aggravating Circumstances  ¶¶ 1-5.)  The trial judge recognized that on the facts the avoiding-arrest and law-enforcement-officer aggravators "tend[ed] to overlap to some degree," so the judge considered them collectively.  (A-1, Sentencing Order, unnumbered, "Aggravating Circumstances ¶ 5.)  The trial judge said the robbery aggravator was "not determinative; the sentence of death would be imposed even if it were not applied." (A-1, Sentencing Order, unnumbered, "Aggravating Circumstances ¶ 3.)  The trial judge did not apply the great-risk aggravator.

*Direct Appeal.*  On direct appeal Mr. Jones challenged the great-risk and

robbery instructions.  (B-1 at 33-36; Point VI, entitled "Whether or Not the Court

Erred in Permitting Evidence of Aggravating Factors and Instructing the Jury as to

Those Improper Aggravating Factors?")  Mr. Jones argued that the facts did not

support the great-risk instruction.  (B-1 at 33 (citing *Kampff v. State*, 371 So. 2d

1007 (Fla. 1979); *Elledge v. State*, 346 So. 2d 988 (Fla. 1977))).  He argued the

robbery was merely incidental to the murder, an "afterthought," and that the

instruction thus was improper under state law.  (B-1 at 34 (citing *Parker v. State*,

458 So. 2d 750 (Fla. 1984))).  Mr. Jones also argued that the jury instructions

"doubled up" the aggravators because the single act of shooting the officer

prevented lawful arrest and furthered the continuing escape while taking the life of

a police officer engaged in his lawful duties.  (B-1 at 35 (citing *Perry v. State*, 395

So. 2d 170 (Fla. 1980))).[12]  Mr. Jones cited state cases for the proposition that the

use of the improper aggravators warranted a remand for resentencing as a matter of

state law.  (B-1 at 36 (citing *Schafer v. State*, 537 So. 2d 988 (Fla. 1989); *Lewis v.

State*, 377 So. 2d 640 (Fla. 1979))).  Mr. Jones did not raise any *federal* issue

arising from the great-risk and robbery instructions.  (B-1 at 33-36.)

The state responded that the *judge* properly applied the aggravators.  (B-2 at

70-72.)  But the state failed to address Mr. Jones's contention that the great-risk and

---

[12] Mr. Jones does not assert a "doubling up" claim here and could not
reasonably do so.  What matters is the combined weight of the aggravators, not
their number.

robbery aggravators were *legally* inapplicable and that the jury thus should not have

been instructed on them.  Instead, the state characterized Mr. Jones's claim as a

contention that the evidence did not support the aggravators as a factual matter, and

the state focused on the aggravators ultimately applied by the trial judge.

The Florida Supreme Court explicitly addressed only the aggravators

considered by the trial judge.  This included the robbery aggravator but not the

great-risk aggravator.  The court's entire analysis was as follows:

> Turning to the penalty phase, the trial court found that five
> aggravating circumstances, 1) committed while under sentence of
> imprisonment, 2) prior conviction of violent felony, 3) committed
> during a robbery, 4) committed to avoid or prevent arrest, and 5)
> victim was a law enforcement officer engaged in performing official
> duties, had been established.  Because factors 4 and 5 overlapped to
> some degree in this case, the court considered those factors
> collectively.  Factors 1, 2, and 4 and 5 are supported by the evidence.
> Number 3, however, is not.  Taking the officer's service weapon,
> technically an armed robbery, was only incidental to the killing, not the
> reason for it.  *See Parker v. State*, 458 So.2d 750 (Fla.1984), *cert.
> denied*, 470 U.S. 1088, 105 S.Ct. 1855, 85 L.Ed.2d 152 (1985).
> Reversal is not warranted, however, because the trial court stated:
> "This circumstance is not determinative; the sentence of death would
> be imposed even if it were not applied."

*Jones I*, 580 So. 2d at 146.

The Florida Supreme Court did not explicitly address Mr. Jones's contention

that the jury should not have been instructed on the great-risk and robbery

aggravators.  But the Florida Supreme Court must have believed the instructions

made no difference.  Had it thought otherwise, it surely would have said so—and it

surely would not have upheld the death sentence.

*State Habeas Proceeding.*   In his state habeas proceeding Mr. Jones resurrected this issue, arguing that the Florida Supreme Court erred in failing to address on direct appeal the jury-instructions claim, and arguing further that allowing the jury verdict to stand despite the erroneous instructions was unconstitutional.  (E-1 at 34-37.)  This was Mr. Jones's first *federal* claim based on the great-risk and robbery instructions.

The state responded that the Florida Supreme Court must have considered Mr. Jones's argument on direct appeal because it was required by statute to do so. The state cited a case in which the Florida Supreme Court explained that its failure to discuss an issue in a death-case direct appeal was not an indication it did not consider the issue as it was statutorily required to do.  (E-2 at 26-27 (citing *Jackson v. State*, 452 So. 2d 533, 536 (Fla. 1984))).  As a result, the state argued the jury-instructions claims were procedurally barred from habeas review, because they had been raised and decided on direct appeal.  The state argued alternatively that the claims were unfounded.  The state noted that "juries may be presumed to have disregarded an aggravator unsupported by the evidence."  (E-2 at 27.)

The Florida Supreme Court held the claim procedurally barred but also briefly addressed the merits:

> Jones next argues that this Court, in light of *Espinosa v. Florida*, 505 U.S. 1079, 112 S.Ct. 2926, 120 L.Ed.2d 854 (1992), erred in

upholding the death sentence even though the advisory jury was instructed upon two aggravators that later were either not found by the trial judge or struck by this Court on direct appeal.  We find this claim to be procedurally barred.

In *Espinosa*, the Supreme Court held that in capital cases neither sentencing authority (advisory jury or trial judge) may weigh an invalid aggravator.  *See id.* at 1082, 112 S.Ct. 2926.  There, the Supreme Court held that the "especially wicked, evil, atrocious or cruel" aggravator was unconstitutionally vague.  *See id.* at 1081, 112 S.Ct. 2926.  In this habeas petition, Jones does not claim that the two aggravators were unconstitutionally vague or otherwise invalid; rather, Jones argues that instructing the jury on aggravators later found to not be supported by the evidence is impermissible.  Thus, there is no *Espinosa* error.

In *Foster v. State*, 679 So.2d 747 (Fla.1996), this Court made clear that a jury is presumed not to have weighed properly instructed aggravators that subsequently are found not to exist.  *See id.* at 754. Clearly, Jones's argument concerning *Espinosa* error is merely an attempt to use habeas to reargue the wisdom of the death sentence in this case.  This issue was adversely decided against Jones on direct appeal; thus, this issue is procedurally barred.  *See Parker v. Dugger*, 550 So.2d 459, 460 (Fla.1989).

*Jones III*, 794 So. 2d at 589-90 (footnotes omitted).

*Federal Habeas Proceeding.*  In this proceeding Mr. Jones asserts that the trial court improperly instructed the jury on the great-risk and robbery aggravators and, more importantly, that the Florida Supreme Court violated the Constitution by failing to reweigh the aggravating and mitigating factors or conduct a harmless-error review.  (Pet. at 123-32.)[13]  Mr. Jones asserts that the Florida Supreme Court

---

[13] Mr. Jones bases his claim partly on *Apprendi v. New Jersey*, 530 U.S. 466 (2000).  Under *Apprendi*, a defendant has a right to a jury trial on any fact, other

held on collateral review that this constitutional claim was resolved against him on

the merits on direct review.  Mr. Jones thus asserts that the claim is preserved for

federal habeas review.  (Pet. at 126, ¶ 6 (citing *Davis v. Singletary*, 119 F.3d 1471,

1479 (11th Cir. 1997) ("Once a state supreme court on direct review has . . . based

its disposition solely on a rejection of the merits of a claim, no amount of

procedural bar holding as to that claim in further proceedings will suffice to bar the

claim from federal habeas review.")).)

### B.  Procedural Bar

A federal court ordinarily "will not review a question of federal law decided

by a state court if the decision of that court rests on a state law ground that is

independent of the federal question and adequate to support the judgment."

*Coleman v. Thompson*, 501 U.S. 722, 729 (1991).  At the trial and on direct appeal,

Mr. Jones challenged these jury instructions only under state law.  He raised not

even a hint of constitutional error.

Mr. Jones thus procedurally defaulted the claim that the trial court committed

---

than a prior conviction, that increases a maximum sentence.  I assume for present
purposes that the entire scheme under which Mr. Jones was sentenced is
inconsistent with *Apprendi*.  *See Ring v. Arizona*, 536 U.S. 584 (2002).  But *Ring*
does not apply retroactively to cases that at the time of the decision were already
final on direct review.  *Schriro v. Summerlin*, 542 U.S. 348 (2004).  Indeed, the
Eleventh Circuit has held more generally that *Apprendi* is not retroactively
applicable to cases on collateral review.  *McCoy v. United States*, 266 F.3d 1245,
1258 (11th Cir. 2001).  Mr. Jones is not entitled to relief under *Apprendi*.

constitutional error by giving these instructions.  Mr. Jones makes no real assertion

to the contrary.  A petitioner can overcome a procedural default by showing cause

for and actual prejudice from the default or by showing that enforcing the default

would result in a "fundamental miscarriage of justice."  *Coleman*, 501 U.S. at 750.

But Mr. Jones has made no such showing and could not do so on these facts.

Mr. Jones's assertion instead is that the Florida Supreme Court said on

collateral review that on the direct appeal it rejected the unconstitutional-instruction

claim on the merits.  As Mr. Jones correctly notes, a claim addressed by the Florida

Supreme Court on direct appeal solely on the merits is preserved for federal review.

*See Davis*, 119 F.3d at 1479.

But the Florida Supreme Court did *not* address any unconstitutional-

instruction claim on the merits on direct appeal; no such claim had been raised.

And on collateral review the Florida Supreme Court did *not* say it had addressed

any unconstitutional-instruction claim on direct appeal.  Instead, the Florida

Supreme Court said that, as required by state law, it had addressed on direct appeal

all the claims Mr. Jones raised on direct appeal.  This included the claim that the

jury instructions violated state law.  But this did not include any claim that the

instructions violated the Constitution; Mr. Jones had raised no such claim.

The Florida Supreme Court also said Mr. Jones was attempting on collateral

review "to reargue the wisdom of the death sentence."  *Jones III*, 794 So. 2d at 590

(citing *Parker v. Dugger*, 550 So. 2d at 460 ("It is important to note that habeas corpus petitions are not to be used for additional appeals on questions which could have been, should have been, or were raised on appeal . . . .")).  At least as applied to the unconstitutional-instruction claim, this was a fair characterization.  Mr. Jones had challenged the instructions on direct appeal and had lost; he was not entitled to mount a new collateral challenge to the same instructions, this time on constitutional rather than only state-law grounds.  In short, Mr. Jones procedurally defaulted the claim he now asserts as claim V in this court—the claim that the trial court violated the Constitution by instructing the jury on the great-risk and robbery aggravators.

On one view Mr. Jones also procedurally defaulted his current claim VI—the claim that the Florida Supreme Court violated the Constitution by failing on direct review to reweigh the aggravating and mitigating factors or conduct a harmless-error review.  Mr. Jones made no assertion of direct appeal that the Constitution required a reweighing or harmless-error review.  Perhaps this was a procedural default.

But on another view, the claim that the Florida Supreme Court itself violated the Constitution could not have been raised on direct review, because the asserted error had not yet occurred.  The claim could have been raised in a petition for rehearing, but nobody has suggested that Mr. Jones's failure to raise the claim in a

petition for rehearing constituted a procedural default.  I assume for present

purposes that the failure to raise the claim in a petition for rehearing did not

constitute a procedural default.

The question, then, is whether a defendant must note on direct appeal, when

challenging an instruction on state-law grounds, that there are federal constitutional

standards that govern the appellate court's consideration of the state-law issues.

Mr. Jones could have done that here, asserting on direct appeal that if the Florida

Supreme Court agreed that the death-penalty instructions violated state law, the

Constitution—not just state law—would require the Florida Supreme Court to

reweigh or conduct a harmless-error review.  But a defendant ordinarily need not

assert on direct appeal that the appellate court must itself comply with the

Constitution.  Thus, for example, nobody would say that if an appellate court

allowed the state to present new evidence on appeal without giving the defendant

notice and an opportunity to be heard—a clear due-process violation—the

defendant would be barred from challenging the action, on the ground that the

defendant procedurally defaulted the claim by failing to assert in the defendant's

initial brief that the appellate court was constitutionally obligated not to do such a

thing.  At least when there is no reason to anticipate a constitutional violation on

appeal, the time to complain about an appellate court's constitutional violation is

after it occurs.  *See Cola v. Reardon*, 787 F.2d 681, 694 (1st Cir. 1986) (observing

in a different procedural context that "to require defendants to object to appellate

tribunal errors *prior* to the appellate opinion itself is, in our view, to impose

unreasonable demands of foresight").

I assume without deciding that Mr. Jones did not procedurally default the

claim he now asserts in this court as claim VI—the claim that on direct appeal the

Florida Supreme Court unconstitutionally failed to reweigh the aggravating and

mitigating factors or to conduct a harmless-error review.

### C.  Merits

Even if not procedurally defaulted, Mr. Jones's constitutional challenge to the

great-risk and robbery instructions and to the Florida Supreme Court's handling of

the instructions fails on the merits.  The challenge to the great-risk instruction fails

because in circumstances like these, a reviewing court properly presumes that a

penalty-phase jury did not find an aggravator that was not supported by the

evidence.  The challenge to the robbery instruction fails for a different reason.  The

United States Supreme Court now has held that in circumstances like these—when

an advisory jury recommends death after receiving a legally-erroneous aggravator

instruction—a state court must reweigh the aggravating and mitigating factors or

conduct a harmless-error review.  But that holding came after the Florida Supreme

Court's decision on direct appeal in this case and does not apply retroactively to

cases on collateral review.  The United States Supreme Court has squarely so held.

This opinion addresses each of these matters in turn.

### 1.  Great Risk

Even accepting all the state's evidence, Mr. Jones did not "knowingly create[] a great risk of death to many persons."  Fla. Stat. § 921.141(5)(c).  The trial court therefore should not have given the great-risk instruction; there was insufficient evidence to support it.  But the instruction itself correctly set out the law.  A defendant is not entitled to relief from a death penalty when an instruction on an aggravating factor correctly sets out the law but the facts do not support it, the jury returns a verdict recommending death, and a reasonable jury could have reached that same verdict even after rejecting the improperly-instructed aggravator. The reason is that in these circumstances, a reviewing court properly presumes that the jury correctly determined the facts and thus did not find the aggravator.  *See Sochor v. Florida*, 504 U.S. 527, 538 (1992); *see also Griffin v. United States*, 502 U.S. 46, 59-60 (1991).

The giving of the great-risk instruction thus did not undermine the jury's advisory verdict or reduce the weight the trial judge could properly give it.  The Florida Supreme Court correctly so concluded.  Mr. Jones is not entitled to relief based on the giving of this instruction.

### 2.  Robbery

The Florida Supreme Court apparently thought the same was true for the

robbery instruction.  But it was not.  The robbery instruction did not correctly set

out the law.  Tracking the statute, the instruction told the jury that if the murder

occurred while Mr. Jones was engaged in a robbery, the jury could weigh this as an

aggravator.  *See* Fla. Stat. § 921.141(5)(d).  The instruction did *not* tell the jury that

a robbery that was merely incidental to a murder could *not* properly be weighed as

an aggravator.  The Florida Supreme Court had so held.  *See Parker v. State*, 458

So. 2d 750 (Fla. 1984).  The Florida Supreme Court held the robbery aggravator

inapplicable on this basis—a basis that was unknown to the jury.

The presumption that a jury disregarded a *factually* unsupported theory does

not apply to a *legally* unsupported theory.  Thus, for example, in *Griffin* the

Supreme Court distinguished the question "whether the evidence sufficed to enable

an alleged fact to be found" from the question "whether the facts adduced at trial

sufficed *in law* to constitute [the prohibited act]."  *Griffin*, 502 U.S. at 55 n.1.  The

Court said:

> Jurors are not generally equipped to determine whether a particular
> theory of conviction submitted to them is contrary to law. . . . When,
> therefore, jurors have been left the option of relying upon a legally
> inadequate theory, there is no reason to think that their own
> intelligence and expertise will save them from that error.

*Id.* at 59.  *Griffin* dealt with guilt or innocence, but its analysis on this point was

followed by *Sochor*, a case dealing with the death penalty.

Here the jury could have found the robbery aggravator factually inapplicable.

Mr. Jones shot the officer first and took his gun later, making it far from certain that the murder occurred while Mr. Jones was engaged in the robbery.  But the more basic flaw in the robbery instruction was that the robbery was only incidental to the murder.  *That* flaw is not shielded from review by the presumption that the jury got the facts right.

Even so, Mr. Jones would be entitled to relief only if (1) an improper instruction to an advisory jury could be deemed to taint a trial judge's death sentence and thus to require the Florida Supreme Court either to reweigh the aggravating and mitigating factors or to conduct a harmless-error review, and (2) the Florida Supreme Court failed to do so.  Mr. Jones fails on the first score, if not also on the second.

First, the United States Supreme Court now has held that an improper instruction to an advisory jury *does* taint a trial judge's death sentence and thus requires the appellate court either to reweigh the aggravating and mitigating factors or to conduct a harmless-error review.  *See Espinosa v. Florida*, 505 U.S. 1079, 1082 (1992) (per curiam) ("[I]f a weighing State decides to place capital sentencing authority in two actors rather than one, neither actor must be permitted to weigh invalid aggravating circumstances.").  But the United States Supreme Court has explicitly held that *Espinosa* is not retroactively applicable to cases on collateral review.  *Lambrix v. Singletary*, 520 U.S. 518 (1997).  Mr. Jones's case was final on

direct review before *Espinosa* was decided.  *Lambrix* thus unequivocally puts to rest

the assertion that Mr. Jones is entitled to relief on this basis.

In asserting the contrary, Mr. Jones relies on *Clemons v. Mississippi*, 494

U.S. 738 (1989).  But *Clemons* dealt with an improper instruction to a penalty-

phase jury in Mississippi, not Florida.  In Mississippi the jury's decision was

binding, not advisory.  Mr. Jones's assertion that *Clemons* settled the issue even for

an advisory jury is flatly at odds with *Lambrix*, which held that the law on this point

was determined by *Espinosa*, not *Clemons*, and that the law as determined by

*Espinosa* is not retroactively applicable to cases on collateral review.

This makes it unnecessary to determine whether the Florida Supreme Court's

decisions should be read to include a finding that the robbery instruction was

harmless, as it plainly was.  If the jury had thought the death sentence unwarranted

based on Mr. Jones's prior violent-felony convictions and his act of killing an

officer to avoid recapture after a prison escape, it is hard to imagine that taking the

officer's gun would have put the case over the top.  Nobody could have thought that

picking up the gun "tipped the scales in favor of death," as Mr. Jones now asserts.

(B-1 at 36.)

Mr. Jones is not entitled to relief based on the Florida Supreme Court's

handling of the robbery instruction.

### D.  Conclusion

As a matter of state law, the trial judge should not have instructed the jury on the great-risk and robbery aggravators.  But Mr. Jones procedurally defaulted any challenge to the instructions under federal law.  And even assuming he did not procedurally default the claim that the Florida Supreme Court was constitutionally required to reweigh the aggravating and mitigating factors or to conduct a harmless-error review, Mr. Jones is not entitled to relief on the merits.

### Claim VII: *Atkins*

Mr. Jones alleges that he is mentally retarded and thus constitutionally ineligible for the death penalty under *Atkins v. Virginia*, 536 U.S. 304 (2002).

### A.  *Procedural History*

*Atkins* held that executing a mentally retarded person violates the Eighth Amendment.  Promptly after the decision, Mr. Jones filed an amended habeas petition in the Florida Supreme Court asserting an *Atkins* claim.  The court relinquished jurisdiction over the claim to the trial court for an evidentiary hearing. The trial court denied the claim.  *Jones v. State*, Case No. 1988CF3111 (June 24, 2005).  Mr. Jones appealed, and the Florida Supreme Court affirmed.  *Jones v. State*, 962 So. 2d 337 (Fla. 2007) (table opinion) (*Jones IV*).

Mr. Jones asked for and obtained leave to amend his federal petition to add an *Atkins* claim.  The claim is timely and not procedurally barred.

### B.  *Mental-Retardation Standard*

*Atkins* left to the states the task of determining what constitutes mental

retardation for this purpose. *Atkins*, 536 U.S. at 317. Florida has defined mental

retardation as:

> significantly subaverage general intellectual functioning existing
> concurrently with deficits in adaptive behavior and manifested during
> the period from conception to age 18. The term "significantly
> subaverage general intellectual functioning," for the purpose of this
> section, means performance that is two or more standard deviations
> from the mean score on a standardized intelligence test specified in the
> rules of the Agency for Persons with Disabilities. The term "adaptive
> behavior," for the purpose of this definition, means the effectiveness or
> degree with which an individual meets the standard of personal
> independence and social responsibility expected of his or her age,
> cultural group, and community. The Agency for Persons with
> Disabilities shall adopt rules to specify the standardized intelligence
> tests as provided in this subsection.

Fla. Stat. § 921.137(1) (2008). The rules adopted under the statute require the

determination of mental retardation to be based on the Stanford-Binet Intelligence

Scale, the Wechsler Intelligence Scale, or other tests meeting specified criteria. Fla.

Admin. Code Ann. R. 65G-4.011 (2008).

The Florida Supreme Court has said a petitioner asserting mental retardation

must show: "(1) significantly subaverage general intellectual functioning, (2)

existing concurrently with deficits in adaptive behavior, and (3) which has

manifested during the period from conception to age 18." *Phillips v. State*, 984 So.

2d 503, 509 (Fla. 2008) (citing Fla. Stat. § 921.137(1)). And Florida has set the

standard for significantly subaverage general intellectual functioning at an IQ of 70

or below.  *See, e.g.*, *Nixon v. State*, 2 So. 3d 137, 142 (Fla. 2009); *(Victor) Jones v.

State*, 966 So. 2d 319, 329 (Fla. 2007) ("[U]nder the plain language of the statute,

'significantly subaverage general intellectual functioning' correlates with an IQ of

70 or below."); *Zack v. State*, 911 So. 2d 1190, 1201 (Fla. 2005) (a defendant must

have an IQ of 70 or below to be ineligible for the death penalty).

The Florida Supreme Court has consistently said that if a petitioner has IQ

scores both above and below 70, the trial court may credit the test it finds more

reliable.  *See Phillips v. State*, 984 So. 2d 503, 510 (Fla. 2008) ("IQ scores ranging

from 67 to 72 did not equate to significantly subaverage general intellectual

functioning" (citing *(Victor) Jones*, 966 So. 2d at 329)); *Rodgers v. State*, 948 So.

2d 655, 661 (Fla. 2006) (upholding a finding that the defendant was not mentally

retarded despite an expert's testimony that the defendant had an IQ of 69 and

exhibited signs of mental retardation); *Burns v. State*, 944 So. 2d 234, 247 (Fla.

2006) (deferring to the trial court's determination that a test showing an IQ of 74

was more credible that a test showing an IQ of 69).

## C.  IQ Tests

Mr. Jones has had six IQ tests in his life.  In 1967, at age 12, the Stanford

Binet Intelligence Test showed an IQ of 67.  In 1989, Dr. Annis administered a test

that showed an IQ of 72.  The Department of Corrections administered a test after

Mr. Jones was convicted; it showed an IQ of 76.  In 1994 and 1995, Dr. Toomer

administered the Revised BETA test, which measures nonverbal IQ, and obtained

scores of 71 and 67.  Finally, Dr. Keyes administered the Stanford-Binet IQ test in

2005 and obtained a score of 79. (J-55; L-8 at 1.)

### D.  State Court Decisions

The trial court found as a fact that Mr. Jones's IQ exceeded 70 and that he

therefore was not mentally retarded as defined by the applicable Florida law.  The

court said that

> having two recent test results, on different approved tests, given by
> different experts on different days, both above 70, eliminates any
> reasonable doubt about this required prong.  Moreover, each result is
> 70 or above, even considering the plus/minus margin of error of 4
> points.

*Jones v. State*, Case No. 1988CF3111 at 2 (June 24, 2005).  The court added that

"Dr. Annis' IQ result of 72 on an approved test in 1989, which test is closest to the

time of trial, is still above the 70 cut-off."  *Id.* at 3.  Because the trial court found

that Mr. Jones did not meet the first prong of the three part test for establishing a

prima facie case of mental retardation, it rejected Mr. Jones's *Atkins* claim without

reaching the other two prongs.

The Florida Supreme Court affirmed, saying:

> Under Florida law, one of the criteria to determine if a person is
> mentally retarded is that he or she must demonstrate "significantly
> subaverage general intellectual functioning," which is defined as
> performance two or more standard deviations from the mean score on a
> standardized intelligence test authorized by the Department of Children
> and Family Services.  *Cherry v. State*, 32 Fla. L. Weekly S151, S154-

55 (Fla. April 12, 2007).  Jones did not demonstrate significantly subaverage general intellectual functioning.  Thus, we affirm the circuit court's order denying Jones' motion to bar execution due to mental retardation.

*Jones IV*, SC03-37 at 1-2.[14]  The court rejected Mr. Jones's claim that he was mentally retarded under *Atkins*.

### E.  Federal Review

Mr. Jones asserts two grounds for his *Atkins* claim.  First, he says the Florida Supreme Court erred in applying *Atkins* to the facts of the case.  Second, he says that under *Ring v. Arizona*, 536 U.S. 584 (2002), a fact establishing a person's eligibility for the death sentence—including the fact that a person is not mentally retarded—must be found by a unanimous jury on proof beyond a reasonable doubt. This order addresses each contention in turn.

### 1. <u>Applying *Atkins*</u>

Mr. Jones notes that several tests measured his IQ below the Florida limit of 70.  But the more credible scores were above 70, including the scores of 79, 76, and 72 on which the trial court relied.  To be sure, there was a very old score of 67, but there was evidence that tests at that time were racially biased, so the score may have been artificially low.  (J at 69-70 ("Q: So the reliability of that number 67 is

---

[14] The text of the Florida Supreme Court opinion in case number SC03-37, as quoted in this opinion,  may be found at www.floridasupremecourt.org/clerk/dispositions/2007/5/03-37.pdf.

somewhat in question? A: Certainly.").)  Dr. Toomer's BETA tests yielded scores of 71 and 67, but even Mr. Jones's own expert Dr. Keyes said BETA is "not a good test" and has serious reliability issues.  (J at 71.)  And the state presented its own expert, Dr. Prichard, who testified that Mr. Jones is not mentally retarded; Dr. Prichard said his own evaluation put Mr. Jones's IQ at 75. (J at 101.)  In short, the trial court's finding that Mr. Jones's IQ was above 70 was not an unreasonable determination of the facts in the light of the evidence.

Mr. Jones says, though, that Florida law is contrary to *Atkins*, because *Atkins* said that an individual with an IQ of 75 or lower is generally deemed retarded.  But *Atkins* did not set a limit of 75.  To the contrary, *Atkins* explicitly left it to each state to set its governing standard.  *Atkins*, 536 U.S. at 317.  To be sure, at some point a state's standard could run afoul of the Constitution; *Atkins* did not cede all federal authority on this issue.  But even if it could be said that Florida's standard, with its reliance on an IQ of 70, had reached that point, Mr. Jones still would not be entitled to relief, because no United States Supreme Court decision so holds.  The Florida Supreme Court's rejection of Mr. Jones's claim plainly was not contrary to or an unreasonable application of settled federal law as determined by the United States Supreme Court.

## 2.  <u>Right to a Jury Trial</u>

Mr. Jones's claim that he has a right to a jury trial on the mental-retardation

issue is foreclosed by the United States Supreme Court's decision in *Schriro v.*

*Smith*, 546 U.S. 6, 7 (2005).  There a federal habeas petitioner asserted an *Atkins*

claim, and the Ninth Circuit held that he had a right to a jury trial in state court on

the question whether he was mentally retarded.  The Supreme Court summarily

reversed, noting that *Atkins* left to each state the task of setting the procedures by

which mental retardation would be determined.  Moreover, any right to a jury trial

on this issue would derive from *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and

*Ring v. Arizona*, 536 U.S. 584 (2002).  But *Apprendi* and *Ring* do not apply

retroactively to cases on collateral review.  *See Schriro v. Summerlin*, 542 U.S. 348

(2004); *McCoy v. United States*, 266 F. 3d 1245, 1258 (11th Cir. 2001).  Mr. Jones

is not entitled to relief on this claim.

## Certificate of Appealability

Rule 11 of the Rules Governing § 2254 Cases requires a district court to

"issue or deny a certificate of appealability when it enters a final order adverse to

the applicant."  Under 28 U.S.C. § 2253(c)(2), a certificate of appealability may

issue "only if the applicant has made a substantial showing of the denial of a

constitutional right."  *See Miller-El v. Cockrell*, 537 U.S. 322, 335-38 (2003); *Slack*

*v. McDaniel*, 529 U.S. 473, 483-84 (2000); *Barefoot v. Estelle*, 463 U.S. 880, 893

n.4 (1983); *see also Williams v. Taylor*, 529 U.S. 362, 402-13 (2000) (setting out

the standards applicable to a § 2254 petition on the merits).  As the Court said in

*Slack*:

> To obtain a COA under § 2253(c), a habeas prisoner must make a
> substantial showing of the denial of a constitutional right, a
> demonstration that, under *Barefoot*, includes showing that reasonable
> jurists could debate whether (or, for that matter, agree that) the petition
> should have been resolved in a different manner or that the issues
> presented were " 'adequate to deserve encouragement to proceed
> further.' "

*Slack*, 529 U.S. at 483-84 (quoting *Barefoot*, 463 U.S. at 893 n.4).  Further, in order

to obtain a certificate of appealability when dismissal is based on procedural

grounds, a petitioner must show, "at least, that jurists of reason would find it

debatable whether the petition states a valid claim of the denial of a constitutional

right and that jurists of reason would find it debatable whether the district court was

correct in its procedural ruling."  *Id.* at 484.

The petitioner has not made the required showing.

## Conclusion

For these reasons,

IT IS ORDERED,

1.  The petition for a writ of habeas corpus, as amended, is denied with prejudice.

2.  The clerk must enter judgment and close the file.

3.  A certificate of appealability is denied.

SO ORDERED on May 11, 2012.

s/Robert L. Hinkle
United States District Judge